Nos. 26-2018 & 26-2772

# In the United States Court of Appeals for the Seventh Circuit

IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION
PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, ET AL.,

*Plaintiffs-Appellees*,

v.

THE BOEING COMPANY AND DENNIS MUILENBURG,

*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:19-cv-02394 (Hon. Franklin U. Valderrama)

## BRIEF OF APPELLANTS

Richard C. Pepperman II
Benjamin R. Walker
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
peppermanr@sullcrom.com
walkerb@sullcrom.com

Jeffrey B. Wall
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jwall@gibsondunn.com

*Counsel for Defendants-Appellants*
*The Boeing Company and Dennis A. Muilenburg*

(*Additional counsel listed on inside cover*)

David N. Whalen
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500
whalend@sullcrom.com

John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862-2000
john.hartmann@kirkland.com
brogers@kirkland.com

Craig S. Primis, P.C.
Katherine R. Katz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
cprimis@kirkland.com
katherine.katz@kirkland.com

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jeffrey B. Wall    Date: September 28, 2026

Attorney's Printed Name: Jeffrey B. Wall

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 1700 M Street, N.W.

Washington, D.C. 20036

Phone Number: (202) 955-8500    Fax Number: N/A

E-Mail Address: jwall@gibsondunn.com

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Richard C. Pepperman II Date: September 28, 2026

Attorney's Printed Name: Richard C. Pepperman II

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 125 Broad Street

New York, New York 10004

Phone Number: (212) 558-4000 Fax Number: N/A

E-Mail Address: peppermanr@sullcrom.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Benjamin R. Walker    Date: September 28, 2026

Attorney's Printed Name: Benjamin R. Walker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 125 Broad Street

New York, New York 10004

Phone Number: (212) 558-4000    Fax Number: N/A

E-Mail Address: walkerb@sullcrom.com

rev. 12/19 AK

Save As Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ David N. Whalen Date: September 28, 2026

Attorney's Printed Name: David N. Whalen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1700 New York Avenue, N.W. Suite 700

Washington, D.C. 20006

Phone Number: (202) 956-7500 Fax Number: N/A

E-Mail Address: whalend@sullcrom.com

rev. 12/19 AK

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ John F. Hartmann Date: September 28, 2026

Attorney's Printed Name: John F. Hartmann

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 333 West Wolf Point Plaza

Chicago, Illinois 60654

Phone Number: (312) 862-2000 Fax Number: N/A

E-Mail Address: john.hartmann@kirkland.com

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Brenton A. Rogers Date: September 28, 2026

Attorney's Printed Name: Brenton A. Rogers

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 333 West Wolf Point Plaza

Chicago, Illinois 60654

Phone Number: (312) 862-2000 Fax Number: N/A

E-Mail Address: brogers@kirkland.com

Save As Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Craig S. Primis Date: September 28, 2026

Attorney's Printed Name: Craig S. Primis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1301 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

Phone Number: (202) 389-5000 Fax Number: N/A

E-Mail Address: cprimis@kirkland.com

rev. 12/19 AK

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2018 & 26-2772

Short Caption: IN RE: THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Boeing Company and Dennis A. Muilenberg

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gibson, Dunn & Crutcher LLP; Sullivan & Cromwell LLP; Kirkland & Ellis LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Katherine R. Katz Date: September 28, 2026

Attorney's Printed Name: Katherine R. Katz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1301 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

Phone Number: (202) 389-5000 Fax Number: N/A

E-Mail Address: katherine.katz@kirkland.com

rev. 12/19 AK

## TABLE OF CONTENTS

*Page*


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 6

STATEMENT OF THE ISSUES ........ 6

STATEMENT OF THE CASE ........ 7

A. Factual Background ........ 7

B. Procedural Background ........ 10

1. The district court's motion-to-dismiss decisions ........ 10

2. Plaintiffs' motion for class certification ........ 14

3. The district court's class-certification decision ........ 22

4. The district court's reconsideration order ........ 25

SUMMARY OF ARGUMENT ........ 28

STANDARD OF REVIEW ........ 33

ARGUMENT ........ 34

I. PLAINTIFFS FAILED TO PROVIDE EVIDENTIARY PROOF OF A CLASSWIDE DAMAGES METHODOLOGY CONSISTENT WITH THEIR LIABILITY THEORY ........ 35

A. *Comcast* Requires Evidence Of A Classwide Damages Methodology Consistent With The Theory Of Liability ........ 36

B. Plaintiffs Did Not Provide Proof Of A Methodology For Calculating Damages On A Classwide Basis ........ 38

C. Plaintiffs Did Not Identify A Liability Theory At Class Certification ....44

D. Plaintiffs' Efforts To Evade *Comcast*'s Requirements Are Unavailing....54

II. PLAINTIFFS FAILED TO PROVE THAT BOEING OPTIONS TRADED IN EFFICIENT MARKETS ....60

A. The District Court Failed Even To Consider Defendants' Arguments On Factors Relevant To Market Efficiency ....62

B. The District Court Failed To Resolve The Battle Between The Parties' Experts At Class Certification....66

CONCLUSION....68

CERTIFICATE OF COMPLIANCE ....70

CERTIFICATE OF SERVICE....71

SHORT APPENDIX

CIRCUIT RULE 30(d) STATEMENT

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020)....................................................................56

*Arandell Corp.* v. *Xcel Energy Inc.*,
149 F.4th 883 (7th Cir. 2025) ........................................................5, 33, 67, 68

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988).........................................................................7, 32, 60, 68

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)....................................................59

*Caisse Nationale de Credit Agricole* v. *CBI Indus., Inc.*,
90 F.3d 1264 (7th Cir. 1996)....................................................................49

*Cammer* v. *Bloom*,
711 F. Supp. 1264 (D.N.J. 1989)...........................................................*passim*

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)...................................................................................*passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ...............................................................66

*Eddlemon* v. *Bradley Univ.*,
65 F.4th 335 (7th Cir. 2023) ......................................................................33

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
563 U.S. 804 (2011)......................................................................................32

*In re Fibrogen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)..................................................65

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025) .....................................................................54

*Goldman Sachs Grp., Inc.* v. *Ark. Tchrs. Ret. Sys.*,
594 U.S. 113 (2021)....................................60

*Industriens Pensionsforsikring A/S* v. *Becton, Dickinson & Co.*,
2023 WL 4981716 (D.N.J. Aug. 3, 2023)....................................65

*Krogman* v. *Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................*passim*

*Lytle* v. *Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) ....................................42

*Marcus* v. *J.C. Penney Co.*,
2016 WL 8604331 (E.D. Tex. Aug. 29, 2016)....................................66

*Off. of Gen. Treasurer ex rel. Emps. Ret. Sys.* v. *Boeing Co.*,
182 F.4th 422 (4th Cir. 2026) ....................................*passim*

*Parko* v. *Shell Oil Co.*,
739 F.3d 1083 (7th Cir. 2014)....................................43

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) ....................................63

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013)....................................42

*Rougier* v. *Applied Optoelectronics, Inc.*,
2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ....................................66

*Santiago* v. *City of Chicago*,
19 F.4th 1010 (7th Cir. 2021) ....................................33, 34

*Unger* v. *Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005)....................................62, 63

*Wal-Mart Stores, Inc.* v. *Dukes*,
564 U.S. 338 (2011)....................................34

*Ward* v. *Apple Inc.*,
784 F. App’x 539 (9th Cir. 2019)....................................42

*West* v. *Prudential Sec., Inc.*,
282 F.3d 935 (7th Cir. 2002) .......................................................... 5, 33, 66, 67

**STATUTES AND RULES**

15 U.S.C. § 78aa ........................................................................................ 6

15 U.S.C. § 78j(b) ...................................................................................... 6

15 U.S.C. § 78t(a) ...................................................................................... 6

28 U.S.C. § 1331 ........................................................................................ 6

Fed. R. Civ. P. 23 ................................................................................ 34, 37

Fed. R. Civ. P. 23(b)(3) ......................................................................*passim*

Fed. R. Civ. P. 23(f) .................................................................................. 6

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................................ 6, 40

## INTRODUCTION

In *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-35 (2013), the Supreme Court held that plaintiffs seeking class certification must provide "evidentiary proof" that "damages are capable of measurement on a classwide basis" in a manner "consistent with [their] liability case." The Fourth Circuit recently concluded in another securities-fraud action against Boeing that the plaintiffs failed to satisfy either of *Comcast*'s requirements: they did not present an actual methodology for measuring classwide damages, and what they offered did not align with their liability case. *Off. of Gen. Treasurer ex rel. Emps. Ret. Sys.* v. *Boeing Co.*, 182 F.4th 422 (4th Cir. 2026). The same is even more true here, where these plaintiffs have done even less to satisfy *Comcast*. Because these plaintiffs too have not satisfied their burden under *Comcast*, this Court should likewise reverse class certification.

In moving for class certification, plaintiffs here barely mentioned damages at all, devoting only one paragraph of their brief to that issue, A.483-484, which was supported by just three pages of boilerplate from their expert, Dr. David Tabak, A.537-540. Dr. Tabak acknowledged that these three pages were "copied and pasted" from his reports in other cases. A.1025-1026. Dr. Tabak's report merely stated that "the 'out-of-pocket' measure" of

damages is the "most common" formula for calculating damages in securities-fraud cases and that he intends to apply that formula here in some unspecified way. A.537. But investors seek to recover their "out-of-pocket" losses in *every* securities case. The out-of-pocket rule is just the legal standard for damages in securities-fraud actions—not an actual methodology for calculating *how much* investors are out of pocket.

In its recent decision, the Fourth Circuit squarely rejected this same approach to damages, holding that merely invoking the out-of-pocket measure of damages does not satisfy *Comcast*'s requirement of a classwide damages methodology. The court noted that the out-of-pocket formula "provide[s] only a legal description of damages" instead of "offering a methodology." *Boeing*, 182 F.4th at 442. As the Fourth Circuit put it, "[t]he out-of-pocket description broadly tells us what securities-fraud damages are—the difference between the price paid or received and the price that would have existed absent the fraud." *Id.* But it says nothing about "how to determine the artificial inflation embedded in [the] stock price on any day of the class period," the critical input needed to apply the out-of-pocket formula to the facts of a given case. *Id.* The Fourth Circuit correctly held that "*Comcast* demands that missing step." *Id.*

Having a classwide damages methodology is important enough in a routine securities class action. This case is anything but. In the wake of two tragic accidents involving Boeing's 737 MAX aircraft, plaintiffs tried to cobble together a claim for securities fraud by challenging dozens of different statements about different subjects made at different times over many months. They claim that the "truth" supposedly concealed by these statements was revealed by a series of "corrective disclosures," beginning with the second accident itself, on five different dates spread over more than half a year. On behalf of a putative class of both purchasers of Boeing common stock and traders of Boeing put and call options, plaintiffs seek more than *$15 billion* in damages. A.792.

This complex case is a perfect example of why plaintiffs must provide a classwide damages methodology when they move for class certification. Without "establishing that damages are capable of measurement on a classwide basis," plaintiffs "cannot show Rule 23(b)(3) predominance" because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34. In moving for class certification here, plaintiffs said effectively nothing about how they intend to measure damages on a classwide basis. Dr. Tabak acknowledged that the

"starting point for calculating damages" under the out-of-pocket formula is "the amount of artificial inflation in the stock," A.538, but he never explained how he intends to measure the alleged inflation in Boeing's stock price on each day of the class period. Indeed, he openly admitted that his report "does not provide any opinion as to which methodology for measuring inflation would be applicable to the allegations and liability theories in this case." A.1038-1039. That admission is fatal to class certification under *Comcast*.

Even if plaintiffs had provided an actual damages methodology, they still flunk *Comcast* because they have not shown that "any model supporting [their] damages case [is] consistent with [their] liability case." *Comcast*, 569 U.S. at 35 (quotation omitted). As the Fourth Circuit explained, "[d]emonstrating consistency" for purposes of *Comcast* "requires a comparison," so plaintiffs must "stat[e] their theory or theories of liability to compare against their identified damages methodology." *Boeing*, 182 F.4th at 441. Here again, plaintiffs did not even try. In his opening report, Dr. Tabak said nothing at all about plaintiffs' liability theory. And in his reply report, he said only that "Plaintiffs' theory of liability is that, through the alleged misrepresentations and omissions, Defendants inflated Boeing's stock price." A.1373. But again, that general statement "would describe virtually all securities-fraud cases."

*Boeing*, 182 F.4th at 443. Under *Comcast*, "[a] theory of liability … cannot be stated at such a high level of generality that it gives no factual context for the plaintiffs' claims." *Id.* at 441 n.17. Plaintiffs' "generic description" of securities fraud is thus "not enough to satisfy *Comcast*." *Id.* at 443.

Finally, in an effort to push their damages claim even further into the stratosphere, plaintiffs also included options traders in their proposed class, raising a host of additional complexities. At least 10,390 unique Boeing options were listed on the Chicago Board Options Exchange during the class period. A.532. To include options traders in the class, plaintiffs were required to prove that all those unique options traded in efficient markets. Plaintiffs did not prove that—but the district court declined to consider the factors courts typically apply to assess the efficiency of securities markets or to resolve the conflicting expert testimony. S.A.57-58. The district court's failure to "'resolve this battle between the experts' at class certification" (S.A.57) was error under this Court's decisions in *Arandell Corp.* v. *Xcel Energy Inc.*, 149 F.4th 883, 893-894 (7th Cir. 2025), and *West* v. *Prudential Securities, Inc.*, 282 F.3d 935, 938 (7th Cir. 2002). Should the Court reach this question, the district court's determination that plaintiffs established that all Boeing options traded in efficient markets during the class period should be vacated.

## JURISDICTIONAL STATEMENT

The district court has federal-question jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because plaintiffs' claims arise under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

On March 16, 2026, the district court granted plaintiffs' motion for class certification. S.A.1-62. On March 30, 2026, defendants timely petitioned for permission to appeal that decision under Federal Rule of Civil Procedure 23(f). No. 26-8007, Doc. 1. This Court granted defendants' petition on May 7, 2026. No. 26-8007, Doc. 23. On June 18, 2026, the district court granted plaintiffs' motion to reconsider one finding in its class-certification decision. S.A.63-81. On July 2, 2026, defendants moved for leave to supplement their Rule 23(f) petition to include a request to appeal the reconsideration order. No 26-2018, Doc. 12. This Court granted that motion on July 27, 2026, No. 26-2018, Doc. 19, and granted defendants permission to appeal the reconsideration order on August 17, 2026, No. 26-8017, Doc. 4. These two appeals were consolidated on August 27, 2026. No. 26-2018, Doc. 20.

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have satisfied their burden under *Comcast* to provide evidentiary proof of a methodology for calculating damages on a

classwide basis in a manner consistent with their liability theory.

2. Whether plaintiffs have satisfied their burden under *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), to prove that the many thousands of unique Boeing options in existence during the class period traded in efficient markets.

## STATEMENT OF THE CASE

### A. Factual Background

On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX aircraft, crashed shortly after takeoff. A.201-203. A system on the airplane, called the Maneuvering Characteristics Augmentation System (MCAS), activated during the flight after receiving inaccurate information from one of the airplane's angle-of-attack (AOA) sensors, which forced the plane's nose down. A.185-186.

After the accident, Boeing issued a bulletin to flight crews identifying the procedure that pilots should follow to counteract the conditions that could result from erroneous AOA data, including repeated activations of MCAS. A.1135-1136. The next day, the Federal Aviation Administration (FAA) issued an Emergency Airworthiness Directive requiring that the 737 MAX flight manual include the procedures described in Boeing's bulletin. A.1138-1142.

On March 10, 2019, Ethiopian Airlines Flight 302, also a 737 MAX aircraft, crashed shortly after takeoff. A.232-233. As with the Lion Air

accident, MCAS activated during the flight based on erroneous data from an AOA sensor, which forced the plane's nose down. A.185-186, A.232.

Three days later, on March 13, 2019, the FAA grounded the entire 737 MAX fleet. A.238. Boeing's public statements during the grounding periodically included estimates of when Boeing believed the FAA would recertify the 737 MAX and the aircraft could return to service. A.317-321.

Plaintiffs seized on these two tragic accidents to assert claims for securities fraud against defendants, seeking to capitalize on the sharp decline in Boeing's stock price after the second accident. *See* A.63, A.323. Plaintiffs claim that dozens of different statements made over nearly a year were fraudulent. A.293-322. Among other things, they contend that defendants, between and after the two accidents, misrepresented the safety of the 737 MAX, MCAS's design, and the procedures to be followed to counteract erroneous MCAS activations. A.402; *see* A.293-316, A.322-324. Plaintiffs also assert that defendants made "optimistic public statements" about the 737 MAX's expected return to service after the FAA's grounding order. A.421; *see* A.316-322. These challenged statements can be grouped into four broad categories:

- Statements in November 2018 after the Lion Air accident about the safety of the 737 MAX;

- Statements in November 2018 that pilots could address erroneous MCAS activations using the procedures identified in Boeing's bulletin to flight crews;
- Statements between March 2019 and May 2019 about the safety of the 737 MAX and MCAS's design; and
- Statements in June 2019 and September 2019 about the 737 MAX's estimated return to service.

A.433.

Plaintiffs allege that the "truth" supposedly concealed by these statements was revealed on five different days, beginning with the second accident itself on March 10, 2019 and ending on October 18, 2019:

- March 10, 2019: The Ethiopian Airlines accident allegedly revealed that statements about the safety of the 737 MAX and the procedures described in Boeing's bulletin were false;
- March 17, 2019: A *Seattle Times* article allegedly revealed that the 737 MAX's design raised safety issues;
- March 21, 2019: A *New York Times* article allegedly revealed that the airplanes involved in the two accidents lacked safety features;
- July 24, 2019: Boeing's disclosure of the risk of a possible halt in production of the 737 MAX allegedly revealed that defendants' prior return-to-service estimates were false; and
- October 18, 2019: The publication of messages involving 737 Chief Technical Pilot Mark Forkner in the *New York Times* allegedly revealed that statements about the safety of the 737 MAX and the procedures described in Boeing's bulletin were false.

*See* A.322-324, A.496-498, S.A.8-9.[1]

Plaintiffs contend that these alleged corrective disclosures "cause[d] the price of the Company's stock to fall as the artificial inflation caused or maintained by" defendants' statements was removed. A.324. Plaintiffs demand more than $15 billion in damages on behalf of the proposed class of both stock purchasers and options traders. A.792.

### B. Procedural Background

This action was filed on April 9, 2019, four weeks after the Ethiopian Airlines accident. A.15. After a lead plaintiff was appointed, plaintiffs filed a consolidated complaint, A.22, which defendants moved to dismiss, A.23.

#### 1. The district court's motion-to-dismiss decisions

The district court (Hon. John J. Tharp, Jr.) granted in part and denied in part defendants' motion to dismiss, concluding that 37 of the 49 alleged misstatements are not actionable. A.118-129. The district court held that defendants' general statements about the safety of the 737 MAX are immaterial as a matter of law based on the language of the statements themselves. A.72-73, A.94-96. As the court explained, those safety statements

[1] Plaintiffs also alleged corrective disclosures on June 26, 2019 and December 16, 2019. Those corrective disclosures have been dismissed from the case. *See* S.A.9, S.A.43-52.

"are just th[e] kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information." A.95. The court also rejected all but two of the alleged corrective disclosures. A.114-117. In particular, the court ruled that the Ethiopian Airlines accident, the first alleged corrective disclosure, "while certainly a grave disaster and business reversal, does not reveal the falsity of any prior statement." A.116.

On August 15, 2023, plaintiffs filed an amended complaint seeking to add back to the case many of the same alleged misstatements and corrective disclosures that had been dismissed a year earlier. A.31. Defendants again moved to dismiss. A.32.

In support of the materiality of defendants' general statements about safety, plaintiffs emphasized that those statements were repeated throughout the class period. *See* A.353 ("Defendants fall far short of establishing the immateriality of their *repeated*, knowingly false assurances to investors touting the MAX's safety.") (emphasis added); A.365 ("After the second crash and the MAX's grounding, Defendants doubled down on their false public assurances, *repeatedly* insisting that the Max was safe ….") (emphasis added); A.381 ("Boeing *repeatedly* claimed that 'the 737 MAX is safe ….'") (emphasis added).

Plaintiffs also argued that the Ethiopian Airlines accident "corrected" defendants' alleged misstatements after the Lion Air accident because it "was a materialization of the safety risks Defendants concealed." A.389. Plaintiffs emphasized that their "new allegations show[] that Defendants concealed MCAS-related safety risks, those risks manifested in the Ethiopian Airlines crash, and the market understood the crash to reveal the truth about those risks." A.354; *see* Dkt. 306 at 5 (sealed version). Plaintiffs asserted that these allegations "establish loss causation under a 'materialization of the risk' theory." A.391.

In granting in part and denying in part defendants' second motion to dismiss, the district court (Hon. Franklin U. Valderrama) reconsidered large parts of the prior ruling. A.402-461.[2] The court concluded that 19 previously dismissed statements, plus one new statement, were instead actionable. A.460. These included seven statements related to the safety of the 737 MAX, which had been dismissed as "immaterial puffery and opinion, nonactionable as a

[2] This case originally was assigned to Judge Tharp, who ruled on defendants' first motion to dismiss. On October 3, 2022, the case was transferred to Judge Maldonado, then a judge on the district court. Following Judge Maldonado's confirmation to this Court, the case was reassigned to Judge Valderrama, who ruled on defendants' second motion to dismiss. *See* A.425-426.

matter of law," due to the statements' vague and general language. A.72-73 (referring to the statements as "vague affirmations of safety"); *see* A.94-96. The seven "safety" statements that the court brought back into the case are:

- "The bottom line here is that the 737 MAX is safe and … we ensure that our airplanes are safe."
- "[T]he airplane is safe. We know how to fly it safely."
- "[T]he 737 MAX is a safe airplane designed, built and supported by skilled men and women."
- "As our customers and their passengers continue to fly the 737 MAX to hundreds of destinations around the world every day, they have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies."
- Passengers "have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies."
- "The 737 MAX is a safe airplane that was designed, built and supported by our skilled employees who approach their work with the utmost integrity."
- "Safety is a core value for everyone at Boeing and the safety of our airplanes, our customers' passengers and their crew is always our top priority. The 737 MAX is a safe airplane."

A.434-439, A.452-453; *see* A.297-298, A.301, A.302-303, A.305-306.

The district court also reconsidered the decision to dismiss the Ethiopian Airlines accident as an alleged corrective disclosure, finding that plaintiffs had adequately alleged that the accident itself corrected defendants' prior statements under a materialization-of-risk theory. A.449-450. In so

ruling, the court expressly relied on plaintiffs' allegations that "the Ethiopian Airlines crash was a 'materialization of the safety risks Defendants concealed'" and that the "crash revealed that the 737 MAX was not safe." A.449.

### 2. Plaintiffs' motion for class certification

Plaintiffs later moved to certify a class of all investors that purchased Boeing common stock and all investors that purchased Boeing call options or sold Boeing put options between November 7, 2018 and December 16, 2019. A.469. Given the vast amount of information about the 737 MAX that became public over the months following the Ethiopian Airlines accident, plaintiffs faced significant challenges in devising a methodology for calculating the alleged inflation in Boeing's stock price on each day of the class period. Yet their brief in support of class certification devoted just one paragraph to damages. A.483-484. It also devoted only one paragraph to Boeing options, A.491-492, even though including options traders in the class increased potential damages by more than a billion dollars.

a. Dr. Tabak's opening report. As their sole evidentiary support on the issue of damages, plaintiffs offered an expert report from Dr. David Tabak. Dr. Tabak's report devoted only three pages to damages. A.537-540. At his deposition, he admitted that this short discussion of damages was "copied and

pasted" from reports he had submitted in other cases. A.1025-1026. Only one paragraph of this section of Dr. Tabak's report even mentions the allegations in this case. A.538.

In discussing damages, Dr. Tabak simply stated that in "most" securities-fraud cases, "damages are calculated under the 'out-of-pocket' measure." A.537. Under that formula, damages are equal to "the amount of artificial inflation in the stock at the time of … purchase less the inflation in the stock at the time of sale." A.538. Even though the amount of artificial inflation is the "starting point for calculating damages" under the out-of-pocket formula, A.538, Dr. Tabak's report failed to explain how he intends to calculate the inflation in Boeing's stock price attributable to defendants' statements on each of the 278 trading days in the proposed class period, A.1054-1056. Dr. Tabak instead merely stated that the "inflation calculation … begins with an event study," and he promised that "a method for determining inflation … will be feasible." A.538-539.[3] At his deposition, Dr. Tabak agreed that his report "does not provide any opinion as to which

[3] An event study is "a statistical test that measures the movement in the price of a stock … by removing the influence of general market and/or industry effects." A.515.

methodology for measuring inflation would be applicable to the allegations and liability theories in this case." A.1038-1039.

Dr. Tabak's report also said nothing at all about plaintiffs' liability theory, beyond noting that plaintiffs have alleged multiple "corrective-disclosure dates" and have been allowed "to proceed on claims based on certain alleged misrepresentations." A.538. When asked about plaintiffs' liability theory at his deposition, Dr. Tabak responded that plaintiffs allege that "defendants misrepresented or failed to provide relevant and truthful information" on a variety of different topics. A.936-937. He then offered the following assurance: "I am confident that I can use the out-of-pocket measure of damages, and that would be consistent with the theory of liability laid out in the complaint." A.1032-1033.

In addition, Dr. Tabak's report contained only a single paragraph that addressed damages for traders of Boeing options. A.539-540. That paragraph asserted that options damages can "be calculated in the same manner that damages for Class members who traded in Boeing stock are calculated, just using different inflation figures specific to the option traded." A.540. In discussing the calculation of inflation for options, Dr. Tabak stated that "one

can determine inflation (in calls) or deflation (in puts) through the use of an options-pricing formula like the Black-Scholes formula." A.539.

In discussing market efficiency, Dr. Tabak acknowledged that "[t]he Chicago Board Options Exchange listed 10,390 unique Boeing options over the Class Period," which "can be grouped into 5,195 pairs of puts and calls." A.532. But he nevertheless relied exclusively "on a test of the put-call parity condition" to assess market efficiency for all Boeing options. A.532. Dr. Tabak concluded: "Overall, the Boeing options passed the put-call parity condition a very large percentage of the time." A.537.

b. Dr. Garmaise's rebuttal. Defendants offered rebuttal expert testimony from Dr. Mark Garmaise, a finance professor at UCLA's Anderson School of Management. A.1146. Dr. Garmaise explained that, "[f]rom an economic perspective, the out-of-pocket measure of damages is not a methodology." A.1499. It instead is a "formula prescribing how damages ought to be computed once the amount of inflation is determined." A.1499. Dr. Garmaise emphasized that the "critical input" to the out-of-pocket formula "is an estimate of inflation, *i.e.*, the difference between the actual security price and what the security price would have been during the class period absent the alleged misrepresentations." A.1499.

“[T]o calculate the amount of inflation present at different times during the class period,” Dr. Garmaise stated, “some economic methodology is required.” A.1499. Yet, Dr. Garmaise noted, “all Dr. Tabak does is mention generic tools that are sometimes used in financial economics” such as event studies. A.1499. Dr. Gamaise explained that, “[w]hile an event study is a tool that can be used to measure the company-specific impact of information on a particular day, it is not by itself a methodology to calculate per share inflation.” A.1500.

Dr. Garmaise further emphasized that developing a classwide damages methodology is particularly challenging in this case because the “information available to the market about the 737 MAX evolved” during the class period. A.1153. As Dr. Garmaise pointed out, “[s]uch information was discussed publicly not only on alleged corrective disclosure dates, but on other dates as well.” A.1153. For example, Dr. Garmaise noted that securities analysts “discussed the safety of the 737 MAX and details around MCAS after the Ethiopian Airlines crash.” A.1159. Dr. Garmaise also found that “[m]ore information about the issues with the 737 MAX, including fixes required by regulators, [was] discussed by analysts during the summer of 2019.” A.1160. As a result, Dr. Garmaise observed that following the publication of the

Forkner messages on October 18, 2019—the last alleged corrective disclosure—"analysts commented that the issues with MCAS revealed by the[] messages were … the same issues that had been disclosed to the market … for months." A.1161.

Dr. Garmaise also pointed out that "Dr. Tabak never addresses … whether his purported method [for calculating damages] is consistent with Plaintiffs' liability theory." A.1168. For instance, Dr. Garmaise explained, "if an alleged corrective disclosure is a materialization of a risk, then the damages methodology would have to measure the extent to which that risk was allegedly misrepresented" during the class period. A.1173. Dr. Garmaise noted that this issue is "relevant for the Ethiopian Airlines crash" and that Dr. Tabak did not provide a "methodology that can determine by how much the risk or uncertainty surrounding this event was allegedly misrepresented" consistent with plaintiffs' materialization-of-risk theory. A.1175; *see* A.1179-1180.

On options, Dr. Garmaise noted that Dr. Tabak proposes "to calculate inflation for Boeing options by using inflation for [Boeing] stock as an input to an option pricing model." A.1151. Dr. Garmaise pointed out, however, that Dr. Tabak does not provide "a methodology for calculating inflation for

Boeing's stock." A.1151-1152. Dr. Garmaise further observed that Dr. Tabak "does not propose a methodology for calculating a critical … input" needed for any option-pricing formula: "the level of volatility that would have prevailed absent the alleged misrepresentations." A.1216-1217; *see* A.1219-1220.

Finally, Dr. Garmaise stressed that "Dr. Tabak performs only one analysis to assess option efficiency, a study of the put-call parity condition." A.1202. As Dr. Garmaise explained, that test "is not in and of itself sufficient to demonstrate the efficiency of Boeing options as a matter of financial economics." A.1151. Dr. Garmaise noted that Dr. Tabak "does not perform the same tests that he used to assess stock market efficiency," the so-called *Cammer* and *Krogman* factors, "to assess options market efficiency." A.1198.[4] For example, Dr. Tabak did not address that "certain options traded infrequently and had high transaction costs, two factors that fail to support the efficiency of the markets for those options." A.1198. Dr. Tabak also performed "no event study analysis of Boeing's options" to assess the reaction of option prices to the release of new information. A.1212-1213.

[4] *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989); *Krogman* v. *Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

c. <u>Dr. Tabak's reply report</u>. Dr. Tabak responded that the out-of-pocket measure of damages "is capable of addressing all of the challenges" raised by Dr. Garmaise. A.1378. Without committing to a methodology for measuring artificial inflation, Dr. Tabak stated that the out-of-pocket formula "is flexible and is regularly used in cases with multiple alleged misrepresentations, multiple alleged corrective disclosures, and when the inflation evolves over time." A.1378-1379. Dr. Tabak thus asserted that the out-of-pocket formula "is more than capable of handling any changes in inflation due to changes in public information or other issues." A.1389.

Dr. Tabak's reply report is equally general about plaintiffs' liability theory. Dr. Tabak merely stated that "Plaintiffs' theory of liability is that, through the alleged misrepresentations and omissions, Defendants inflated Boeing's stock price." A.1373. He then asserted that nothing in his initial report's damages discussion "is inconsistent with that theory of liability." A.1373.

In response to Dr. Garmaise's criticism that he did not account for plaintiffs' reliance on a materialization-of-risk theory for one alleged corrective disclosure, Dr. Tabak represented that he does not plan to calculate damages based on that theory, but rather intends to assume that, "had

Defendants made proper disclosures at the start of the Class Period, the 737 MAX would have been grounded" after the Lion Air accident. A.1378. As a result, Dr. Tabak emphasized, "for my damages analysis, I will not … concern myself with issues related to any materialization of risk." A.1378. Dr. Tabak also stated: "[S]hould I choose to employ a damages methodology that depends on the realization of a concealed risk," such an approach would be feasible because "there are sources … that I could utilize." A.1395.

On options, Dr. Tabak stated that the level of volatility but for the alleged misstatements could be measured through different techniques. A.1419-1420. He also acknowledged that it is "technically true" that his "test of put-call parity alone is insufficient to demonstrate efficiency" as a matter of financial economics. A.1404. Yet he continued to insist that the *Cammer* and *Krogman* factors are not relevant to option efficiency. A.1405.

**3. The district court's class-certification decision**

Without holding oral argument, the district court granted in part and denied in part plaintiffs' motion, certifying a class of "all persons or entities who purchased or otherwise acquired Boeing common stock and/or call options or sold put options between November 7, 2018 and October 18, 2019." S.A.62. The court shortened the proposed class period by two months, ending it on

October 18, 2019 rather than on December 16, 2019 as plaintiffs had requested. S.A.43-52. But the court rejected defendants' *Comcast* arguments and included options traders in the certified class.

On *Comcast*, the district court held that Dr. Tabak's proposal to use an event study and the out-of-pocket measure of damages "is all Rule 23(b)(3) and *Comcast* require[]." S.A.28. The court reasoned that the out-of-pocket formula "is the standard measurement of damages in Section 10(b) securities cases." S.A.28. The court further stated that "variations in inflation—including [those] caused by repetition of allegedly false and misleading statements"—can be "accounted for in an out-of-pocket" measure of damages. S.A.33.

The district court next addressed whether Dr. Tabak's damages discussion for the Ethiopian Airlines accident is consistent with plaintiffs' "'materialization of the risk' theory of liability." S.A.35. The court noted that plaintiffs "invoked such a theory in their opposition to Defendants' second motion to dismiss," arguing that the Ethiopian Airlines accident "'was a materialization of the safety risks' supposedly concealed by [defendants'] statements after the Lion Air accident." S.A.35. The court emphasized that it "allowed Plaintiffs to proceed with their claim that the Ethiopian Airlines

Crash functioned as a corrective disclosure based on [that] allegation." S.A.41. And the court stressed that it "was not clear from the face of the Amended Complaint" that plaintiffs were pursuing "a damages theory" based on an assumed grounding of the 737 MAX at the start of the class period. S.A.41. The district court thus held that it "will not consider [a] damages model based on the assumption that the 737 MAX would have been grounded" at the start of the class period "had [defendants] made proper disclosures," S.A.42, but that Dr. Tabak "could construct a damages model [for] calculating inflation … based on a 'materialization of the risk' theory," S.A.40; *see* S.A.42-43.

On options, the district court noted that Dr. Tabak proposed to calculate damages "using substantially the same out-of-pocket damages methodology used for common stock, combined with the formulaic application of an options pricing formula." S.A.58. Although the court acknowledged that Dr. Tabak's opening report "failed to explain how he would account for the volatility of Boeing's stock price absent the alleged fraud"—an essential input to any options-pricing formula—the court noted that Dr. Tabak's reply report "expands on his methodology." S.A.60. The court ultimately concluded that the question of stock-price volatility is "premature at the class certification stage." S.A.60.

With respect to market efficiency, the district court stated that other "courts have found the fact that options pass the put-call parity test to be sufficient to establish options efficiency." S.A.56 (citing two cases). After reciting the experts' competing contentions, the court "decline[d] to resolve 'this battle between the experts' at class certification." S.A.57. The district court also determined that plaintiffs "did not need to apply the *Cammer* and *Krogman* factors to options," and thus the court did "not examine Defendants' arguments related to those factors." S.A.58.

#### 4. The district court's reconsideration order

Four days before the district court ruled on class certification, plaintiffs moved to supplement the class-certification record with Dr. Tabak's merits-stage report, which plaintiffs had recently served. A.1559-1672. In that report, Dr. Tabak finally committed to a methodology for measuring the inflation in Boeing's stock price throughout the class period: Dr. Tabak's merits report uses a constant-dollar measure of inflation, with no variations in the level of inflation between alleged corrective disclosures.[5] A.1597-1601.

[5] This methodology assumes that each corrective disclosure corresponds to a specific, unchanging dollar amount of inflation in Boeing's stock price. For example, Dr. Tabak asserts that the dollar amount of per-share inflation in Boeing's stock price remained unchanged ($120.99) from November 7, 2018 to March 8, 2019. A.1657-1658.

The district court denied plaintiffs' motion to supplement the class-certification record and thus did not consider Dr. Tabak's merits report in granting class certification. S.A.23 n.6.

Despite Dr. Tabak's assurance at class certification that he could develop a methodology for calculating damages arising from the Ethiopian Airlines accident consistent with a materialization-of-risk theory of liability, A.1394-1395, his merits-stage report contained no such methodology. Instead, in calculating damages arising from that alleged corrective disclosure, Dr. Tabak's constant-dollar methodology relied exclusively on the assumption that the 737 MAX would have been grounded at the start of the class period but for the alleged misstatements. A.1565-1576. Because the district court's class-certification decision rejected that assumption as a basis for calculating damages, S.A.42, plaintiffs moved for limited reconsideration, asking the district court either to revisit that "one finding" or to grant plaintiffs leave to amend Dr. Tabak's merits report "to conform to the Court's finding." A.1676.

The district court granted plaintiffs' motion for limited reconsideration. In permitting plaintiffs to change liability theories at class certification on one of the five alleged corrective disclosures, the district court criticized plaintiffs for failing to identify in their class-certification motion "the damages theory

they planned to employ relating to the Ethiopian Airlines Crash." S.A.67. The court pointed out that plaintiffs instead waited until their reply brief to say that Dr. Tabak intends to assume that, "if Defendants had disclosed the full truth, there is a 100 percent chance that the 737 MAX would have been grounded at the outset of the class period." S.A.67.

The district court explained that plaintiffs' bareboned class-certification motion created confusion because the focus of plaintiffs' theory of liability as to the Ethiopian Airlines accident had been that "the crash revealed *safety* risks allegedly concealed by Defendants' statements." S.A.74 (emphasis in original). The court observed that, "in opposing Defendants' [second] motion to dismiss," plaintiffs had "stressed that the 'Ethiopian Airlines Crash … was a materialization of the safety risks Defendants concealed'" and that the court had denied defendants' motion based on that allegation. S.A.74 (alteration in original).

The district court nevertheless granted reconsideration and allowed plaintiffs to switch theories. The court justified this decision because plaintiffs were able to identify some support for their new theory in an allegation in one sentence of one paragraph of their 551-paragraph complaint—namely, Paragraph 278's allegation that the Ethiopian Airlines accident "'revealed the

true nature of the risk[] of … regulatory action grounding the 737 MAX fleet.'" S.A.75 (alteration in original); *see* A.235. The district court emphasized that its "misunderstanding was occasioned in large part by Plaintiffs' failure to adequately explain the support behind this theory in the class certification briefing." S.A.78-79. Because Dr. Tabak's merits report "does not include a damages model" based on a materialization-of-risk theory, the court also "reconsider[ed] its decision to allow Plaintiffs to proceed" on that theory. S.A.80.

## SUMMARY OF ARGUMENT

I. The district court misapplied *Comcast*. In *Comcast*, the Supreme Court held that plaintiffs seeking class certification cannot satisfy Rule 23(b)(3)'s predominance requirement without "evidentiary proof" that "damages are capable of measurement on a classwide basis" in a manner "consistent with [their] liability case." 569 U.S. at 33-35 (quotation omitted). *Comcast* thus requires two separate showings at class certification. First, plaintiffs must provide proof of a methodology for measuring damages on a classwide basis. *Boeing*, 182 F.4th at 440-441. Second, they must show that their identified damages methodology is consistent with their theory of liability. *Id.* at 441. Plaintiffs here did neither.

In moving for class certification, plaintiffs did not offer a methodology for calculating classwide damages. Their expert, Dr. Tabak, instead simply noted that "damages are calculated under the 'out-of-pocket' measure" in "most" securities-fraud cases. A.537. That recitation of the legal standard for damages in securities cases does not satisfy *Comcast*'s requirement of a damages methodology. "Methodologies require more than a legal description of what damages are generically—they must explain how damages will be measured in a specific case." *Boeing*, 182 F.4th at 440. Despite acknowledging that the "starting point for calculating damages" under the out-of-pocket formula is "the amount of artificial inflation in the stock," A.538, Dr. Tabak never explained how he intends to quantify, on each day of the class period, the alleged inflation in Boeing's stock price supposedly created by defendants' statements. This is alone ground for reversal of class certification because "*Comcast* demands that missing step." *Boeing*, 182 F.4th at 442.

Plaintiffs also failed to commit to a liability theory at class certification. Dr. Tabak's opening report said nothing about plaintiffs' theory of liability. After defendants pointed out that deficiency, Dr. Tabak's reply report responded that "Plaintiffs' theory of liability is that, through the alleged misrepresentations and omissions, Defendants inflated Boeing's stock price."

A.1373. But that general statement "would describe virtually all securities-fraud cases." *Boeing*, 182 F.4th at 443. As the Fourth Circuit held, "[s]uch a generic description … is not enough to satisfy *Comcast*." *Id.* at 443. This, too, is alone ground for reversal of class certification.

To be sure, Dr. Tabak's reply report articulated one potential theory concerning a single alleged corrective disclosure—the Ethiopian Airlines accident. In response to defendants' argument that he had not addressed plaintiffs' allegations that the Ethiopian Airlines crash was a materialization of the safety risk concealed by defendants' statements, Dr. Tabak's reply report disavowed reliance on a materialization-of-risk theory in calculating damages for that alleged corrective disclosure. Dr. Tabak stated that he instead intends to assume that the 737 MAX would have been grounded at the start of the class period but for defendants' statements.

As the district court correctly held in its class-certification decision, Dr. Tabak's assumption is inconsistent with the materialization-of-risk theory on which plaintiffs relied in opposing defendants' motion to dismiss the Ethiopian Airlines accident as a corrective disclosure. The district court later erred in reconsidering that finding. Plaintiffs should not be permitted to switch liability theories midstream, using one to survive a motion to dismiss

and then another to certify a class when the first theory creates challenges for calculating damages. In any event, plaintiffs' new "grounding" theory is relevant to only *one* of the five alleged corrective disclosures in this case—the Ethiopian Airlines accident. Plaintiffs have not identified any liability theory for the other four alleged corrective disclosures.

Plaintiffs' submission of Dr. Tabak's merits report—which finally identified a methodology for measuring the alleged inflation in Boeing's stock price—four days before the class-certification ruling does nothing to remedy plaintiffs' failure to satisfy *Comcast*. The district court *denied* plaintiffs' motion for leave to supplement the class-certification record with Dr. Tabak's merits report and did not otherwise mention that report anywhere in its class-certification decision. S.A.23 n.6. After the class was certified, the district court's reconsideration order did not assess whether Dr. Tabak's merits report satisfies *Comcast*'s requirements. It would be "inappropriate to let a class-certification decision stand based on a report which the district court didn't even consider in certifying a class in the first place." *Boeing*, 182 F.4th at 447.

Moreover, even Dr. Tabak's merits report, which employs a constant-dollar measure of inflation, does not satisfy *Comcast*. As the Fourth Circuit held, "[i]t isn't consistent with [plaintiffs'] allegations to assert a damages

methodology based on the conclusion that [defendants'] varying statements—of different kinds, at different points in time, with different industry and microeconomic conditions and with evolving investors' perceptions of the riskiness of a Boeing investment—would maintain the alleged fraud by an exact [dollar amount] that never changes." *Boeing*, 182 F.4th at 448. Those words apply with equal force here.

Because plaintiffs have failed to satisfy their evidentiary burden under *Comcast*, the district court's order certifying a class should be reversed.

II. Should the Court reach the question, the district court also erred in including options traders in the class. To invoke a presumption of reliance for options traders under *Basic*, plaintiffs were required to prove that all Boeing put and call options traded in efficient markets during the class period. Without that presumption, individual reliance issues "would overwhelm[] the common ones" and prevent plaintiffs "from proceeding with a class action." *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 810 (2011).

At least 10,390 unique Boeing options were listed on the Chicago Board Options Exchange during the class period. A.532. Despite this wide variety of Boeing options, Dr. Tabak opined that all Boeing put and call options traded in efficient markets during the class period based on a "put-call parity"

analysis of a subset of Boeing option series. In accepting that analysis, the district court committed two legal errors. First, the court did not even consider defendants' arguments related to the factors that courts and financial economists typically analyze to assess the efficiency of securities markets. At least three of those factors undercut plaintiffs' claim of market efficiency for Boeing options. Second, the district court "decline[d] to resolve th[e] battle between the experts at class certification." S.A.57 (quotation omitted). Before certifying a class, district courts must resolve all expert disputes on issues relevant to class certification. *See Arandell*, 149 F.4th at 893-894; *West*, 282 F.3d at 938. The district court admittedly did not do so here.

## STANDARD OF REVIEW

This Court "review[s] the grant of a motion for class certification for an abuse of discretion, which can occur when a district court commits legal error." *Santiago* v. *City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021) (quotation omitted). This standard of review is "exacting because a decision regarding certification can have a considerable impact on the playing field of litigation." *Eddlemon* v. *Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023) (quotation omitted). As discussed below, the district court erred as a matter of law by failing to require "evidentiary proof" that "damages are capable of

measurement on a classwide basis" in a manner "consistent with [plaintiffs'] liability case," *Comcast*, 569 U.S. at 33-35 (quotation omitted), and by failing to consider relevant evidence undercutting plaintiffs' claim of market efficiency for Boeing options and to resolve the dispute between the parties' experts on market efficiency.

## ARGUMENT

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33 (quotation omitted). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Id.* (quotation omitted). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011). Rather, "[t]he party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Santiago*, 19 F.4th at 1016 (quotation omitted). Because plaintiffs failed to satisfy their burden of proof here, the district court erred in certifying a class.

## I. PLAINTIFFS FAILED TO PROVIDE EVIDENTIARY PROOF OF A CLASSWIDE DAMAGES METHODOLOGY CONSISTENT WITH THEIR LIABILITY THEORY.

Before a class can be certified, *Comcast* requires evidentiary proof that damages are capable of measurement on a classwide basis in a manner consistent with the plaintiffs' liability theory. 569 U.S. at 33-35. Rather than provide a classwide damages methodology, plaintiffs here simply pointed to the "out-of-pocket" measure of damages. A.483-484. But that formula is not a methodology; it is just the legal standard for damages in securities cases. *See* A.1498-1500. At class certification, plaintiffs never explained how they intend to quantify, on each day of the class period, the alleged inflation in Boeing's stock price supposedly created by dozens of different statements. "*Comcast* demands that missing step." *Boeing*, 182 F.4th at 442.

Nor did plaintiffs identify their theory of liability at class certification, leaving the district court with nothing to test any damages methodology against. Although plaintiffs' reply brief described a potential theory for just one of the five alleged corrective disclosures—plaintiffs' so-called "grounding" theory—plaintiffs relied on a *different* theory in opposing defendants' motion to dismiss. Under *Comcast*, plaintiffs are not permitted to "bob and weave pre-certification" and evade Rule 23(b)(3)'s requirements until they have "the

leverage of class certification to use as a sword in litigation." *Boeing*, 182 F.4th at 447. Faced with these fundamental failures of proof, plaintiffs' various attempts to evade *Comcast*'s requirements are meritless.

### A. *Comcast* Requires Evidence Of A Classwide Damages Methodology Consistent With The Theory Of Liability.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast* applied this requirement to a proposed class of cable subscribers seeking damages for violations of federal antitrust law. In their class-certification motion, the plaintiffs proposed four theories of antitrust impact. 569 U.S. at 31. After accepting only one of those theories for class treatment, the district court granted class certification even though the plaintiffs' damages methodology "did not isolate damages" resulting from that one theory. *Id.* at 31-32. On appeal, the defendants argued that certification was improper because the plaintiffs' methodology "failed to attribute damages resulting from … the only theory of injury remaining in the case." *Id.* at 32. The Third Circuit rejected that argument, holding that "such an 'attac[k] on the merits of the methodology [had] no place'" at class certification. *Id.* (alteration in original). The Supreme Court granted certiorari to consider

whether "certification was improper because [the plaintiffs] had failed to establish that damages could be measured on a classwide basis." *Id.* at 32 n.4.

The Supreme Court reversed the grant of class certification, holding that the class "was improperly certified under Rule 23(b)(3)." 569 U.S. at 34. The Court explained that plaintiffs must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* at 33. Emphasizing that the "rigorous analysis" required by Rule 23 "will frequently entail overlap with the merits of the plaintiff's underlying claim," the Court concluded that the plaintiffs fell "far short of establishing that damages are capable of measurement on a classwide basis." *Id.* at 33-34 (quotation omitted). Without proof that damages can be measured on a classwide basis, the Court stressed, the plaintiffs "cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34.

The Supreme Court rejected the plaintiffs' proposed methodology because it "failed to measure damages resulting from the particular" theory on which the plaintiffs' liability case "is premised." 569 U.S. at 36. Although damages "[c]alculations need not be exact" at class certification, the Court held that a plaintiff's damages methodology "must be consistent with its liability

case." *Id.* at 35 (quotation omitted). Otherwise, the Court explained, "at the class-certification stage *any* method of measurement [would be] acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 36 (emphasis in original). "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

As the Fourth Circuit recognized, *Comcast* "requires plaintiffs, at the class-certification stage, to put forth evidentiary proof of a damages methodology showing how damages are calculable on a class-wide basis in a manner that is consistent with their theory of liability." *Boeing*, 182 F.4th at 428. This requires two separate showings. First, plaintiffs "must put forth a damages 'methodology'" demonstrating how "damages can be measured on a class-wide basis." *Id.* at 440-441. Second, any damages methodology "must be consistent with [plaintiffs'] liability case." *Id.* at 441 (quotation omitted). Plaintiffs here failed to satisfy both of those requirements.

### B. Plaintiffs Did Not Provide Proof Of A Methodology For Calculating Damages On A Classwide Basis.

In moving for class certification, plaintiffs did not offer an actual methodology for calculating damages on a classwide basis. Dr. Tabak's report instead included a copied-and-pasted discussion of damages that he has used in every securities case since *Comcast* regardless of the plaintiffs' allegations.

A.1020-1026. Dr. Tabak simply noted that "damages are calculated under the 'out-of-pocket' measure" in "most" securities-fraud cases. A.537.

Dr. Tabak acknowledged that the "starting point for calculating damages" under that measure is "the amount of artificial inflation in the stock" price when investors purchased and sold their shares, and he admitted that "there may be questions about how to calculate inflation" in this case. A.538-539. But his report offered no methodology for measuring the alleged inflation in Boeing's stock price during the class period, beyond saying that the calculation could "begin[] with an event study." A.538. Indeed, Dr. Tabak conceded that his report "does not provide any opinion as to which methodology for measuring inflation would be applicable to the allegations and liability theories in this case." A.1038-1039. Instead, he merely promised that "a method for determining inflation at any date, and thus damages for any Class member, will be feasible." A.539.

While longer than his opening report, Dr. Tabak's reply report likewise offered no methodology for calculating the alleged inflation in Boeing's stock price throughout the class period. Doubling down on his mere invocation of the out-of-pocket rule, Dr. Tabak asserted that this measure of damages "is capable of addressing all of the challenges" identified by defendants. A.1378.

Without committing to a methodology for measuring artificial inflation, Dr. Tabak reiterated that the out-of-pocket formula "is more than capable of handling any changes in inflation due to changes in public information or other issues." A.1389.

The district court accepted Dr. Tabak's reports as sufficient evidentiary proof of a classwide damages methodology under *Comcast*, agreeing that "the correct measure of damages in a [Rule 10b-5] case is out-of-pocket loss." S.A.23. After noting that this measure of damages "is widely accepted," the court held that Dr. Tabak's proposal to use an event study and the out-of-pocket formula "is all Rule 23(b)(3) and *Comcast* require[]." S.A.27-28. The court reasoned that this "standard measurement of damages in Section 10(b) securities cases" is flexible enough to account for "variations in inflation—including [those] caused by repetition of allegedly false and misleading statements." S.A.28, S.A.33. The court thus concluded that "the existence of evolving public information" that would cause the level of any inflation in Boeing's stock price to vary during the class period "does not prevent certification of a Class." S.A.31.

The district court erred in treating the out-of-pocket formula as a damages methodology under *Comcast*. Investors want to recover their out-of-

pocket losses in *every* securities case. As the Fourth Circuit explained, however, *Comcast* "require[s] more than a legal description of what damages are generically—[plaintiffs] must explain how damages will be measured in [the] specific case." *Boeing*, 182 F.4th at 440. "Rather than offering a methodology" to measure artificial inflation, Dr. Tabak "provided only a legal description of damages." *Id.* at 442. "For a securities fraud case, that's effectively saying that [plaintiffs] are seeking compensatory damages." *Id.*

The Fourth Circuit thus squarely held that the mere invocation of the out-of-pocket formula fails under *Comcast*:

> The out-of-pocket description broadly tells us what securities-fraud damages are—the difference between the price paid or received and the price that would have existed absent the fraud. But it doesn't tell us how to determine the artificial inflation embedded in Boeing's stock price on any day of the class period. *Comcast* demands that missing step.

*Boeing*, 182 F.4th at 444. While "*Comcast* doesn't require a party seeking class certification to actually calculate damages," *Comcast* "requires more than just stating the legal description of damages." *Id.* at 443.

Dr. Tabak's reports fell well short of satisfying *Comcast*'s requirement of evidentiary proof of a classwide damages methodology. In support of certification, Dr. Tabak offered only a description of the legal standard for damages that "is so general that it would apply in any securities fraud case,"

and he "never committed to any methodology" for measuring inflation, beyond stating that "he could perform an event study to measure price reaction." *Boeing*, 182 F.4th at 442. Indeed, Dr. Tabak's reference to out-of-pocket damages is analogous simply to saying that benefit-of-the-bargain damages are the standard measure for breach-of-contract claims. It is not tied in any way to the theory of liability or the facts of the particular case. As the Fourth Circuit held, "[t]hat is not enough." *Id.* If it were, *Comcast* would be a dead letter in securities cases.

Other courts of appeals have agreed that such generalities are insufficient to satisfy *Comcast*. For instance, the Ninth Circuit has noted that "[m]erely gesturing at a model or describing a general method will not suffice" under Rule 23(b)(3). *Lytle* v. *Nutramax Labs., Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024); *see also Ward* v. *Apple Inc.*, 784 F. App'x 539, 541 (9th Cir. 2019) ("The plaintiffs here have done even less than the *Comcast* plaintiffs: Instead of providing an imperfect model, they have provided only a promise of a model to come."). Discussing *Comcast*, the D.C. Circuit likewise has emphasized: "No damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

This failure of proof is also fatal to plaintiffs' attempt to satisfy *Comcast* for Boeing options. To calculate options damages, Dr. Tabak proposed to use whatever inflation figures he calculates for Boeing stock as an input to an options-pricing formula, which then could be used to translate that inflation into inflation for options. A.1151. As a result, Dr. Tabak's failure to provide a methodology for calculating inflation for Boeing stock necessarily means that he also has not provided a methodology for calculating inflation for Boeing options that complies with *Comcast*. A.1151-1152, A.1216.

Dr. Tabak also failed to propose a methodology for calculating an essential input for any options-pricing formula: the stock-price volatility that would have existed had defendants not made the alleged misstatements. A.1216. The district court erred in holding that this question is "premature at the class certification stage." S.A.60. "A district judge may not 'refus[e] to entertain arguments against [plaintiffs'] damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination.'" *Parko* v. *Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (quoting *Comcast*, 569 U.S. at 34).

### C. Plaintiffs Did Not Identify A Liability Theory At Class Certification.

Demonstrating consistency between a damages methodology and plaintiffs' liability theory "requires a comparison." *Boeing*, 182 F.4th at 441. Accordingly, plaintiffs must "identify both comparators, stating their theory or theories of liability to compare against their identified damages methodology." *Id.* Here, "plaintiffs didn't identify their theory of liability [at] the class-certification stage." *Id.* at 443. In fact, their liability theory has been a moving target since the motion-to-dismiss phase of the case.

Recognizing the challenges that their claims create for devising a classwide damages methodology, plaintiffs tried to say as little as possible about their liability theory at class certification. When pressed by defendants for a theory, plaintiffs offered only a general description of securities fraud that would apply to any Section 10(b) action. Under *Comcast*, however, "[a] theory of liability … cannot be stated at such a high level of generality that it gives no factual context for the plaintiffs' claims." *Boeing*, 182 F.4th at 441 n.17. Rather, plaintiffs "must identify their legal theory by reference to the factual context from which it arises." *Id.* Plaintiffs' failure to satisfy this requirement is by itself ground for reversal.

Nor can plaintiffs satisfy *Comcast*'s requirement that they identify a liability theory to compare against their damages methodology by pointing to Dr. Tabak's assumption that the 737 MAX would have been grounded at the beginning of the class period but for defendants' statements—a theory that plaintiffs raised for the first time in their reply brief and that applies to only *one* of the five alleged corrective disclosures in this case. In its class-certification decision, the district court correctly rejected plaintiffs' belated "grounding" theory as inconsistent with the materialization-of-risk-theory on which plaintiffs relied in opposing defendants' motion to dismiss. The court later erred in reconsidering that finding, effectively endorsing plaintiffs' strategy to "bob and weave pre-certification and not commit to" a theory until they have "the leverage of class certification to use as a sword in litigation." *Boeing*, 182 F.4th at 447.

1. Plaintiffs' opening brief and Dr. Tabak's initial report said nothing at all about plaintiffs' theory of liability. Dr. Tabak merely observed that plaintiffs have alleged multiple "corrective-disclosure dates" and that the district court allowed plaintiffs "to proceed on claims based on certain alleged misrepresentations." A.538.

After Dr. Garmaise noted that Dr. Tabak had not addressed consistency "with Plaintiffs' liability theory," A.1168, Dr. Tabak responded in his reply report that "Plaintiffs' theory of liability is that, through the alleged misrepresentations and omissions, Defendants inflated Boeing's stock price," A.1373. He then asserted that "[t]here is nothing in" his initial report "that is inconsistent with that theory of liability." A.1373. In their reply brief, plaintiffs argued in equally general terms that their "theory of liability is straightforward: Defendants made material misrepresentations that artificially inflated the price of Boeing stock." A.1343.

But those general statements "would describe virtually all securities-fraud cases." *Boeing*, 182 F.4th at 443. As such, they are not "a liability theory" for purposes of *Comcast*. *Id.* at 446. Plaintiffs' description of their liability theory instead merely "restates the generic securities-fraud principles that misstatements inflate and the truth deflates," which "describes every Section 10(b) case." *Id.* "Such a generic description of securities fraud is not enough to satisfy *Comcast*." *Id.* at 443. As the Fourth Circuit put it, "[a] generic description that fits every case define[s] nothing for this one." *Id.* at 446. This failure of proof is alone ground for reversal.

2. Plaintiffs previously argued that they offered a theory of liability at class certification for one alleged corrective disclosure—their so-called "grounding" theory. No. 26-8017, Doc. 2 at 7, 15-16. But that theory, belatedly raised in plaintiffs' reply brief, is inconsistent with the materialization-of-risk theory on which plaintiffs relied in opposing defendants' motion to dismiss.

The complaint here alleges that defendants misrepresented the safety of the 737 MAX after the Lion Air accident and that, when the second accident occurred and "the risk concealed by [those statements] materialized, investors suffered losses as the price of Boeing common stock declined." A.322. The complaint asserts that "Boeing's stock price plummeted" after the Ethiopian Airlines accident because the crash revealed that, "contrary to Defendants' statements, the 737 MAX was not safe." A.235.

In opposing defendants' motion to dismiss the Ethiopian Airlines accident as a corrective disclosure, plaintiffs expressly relied on those allegations, arguing that they show that "the Ethiopian Airlines Crash … was a materialization of the safety risks Defendants concealed and, therefore, corrected those statements." A.389. According to plaintiffs, such "allegations establish loss causation" for that alleged corrective disclosure "under a 'materialization of the risk' theory." A.391. In denying this part of defendants'

motion, the district court expressly relied on plaintiffs' materialization-of-risk allegations. A.449-450.

Dr. Garmaise thus observed in his rebuttal report that Dr. Tabak failed to address plaintiffs' theory that the Ethiopian Airlines accident was a materialization of the safety risks supposedly concealed by defendants' alleged misstatements. A.1176-1177. Rather than address the complications raised by that theory, Dr. Tabak pivoted to a different theory entirely and disavowed any reliance on materialization of the risk. Dr. Tabak stated that he instead intends to base his damages analysis for the Ethiopian Airlines accident on the assumption that, "had Boeing made proper disclosures at the start of the Class Period, the 737 MAX would have been grounded" after the Lion Air accident. A.1394. Dr. Tabak thus emphasized that he will not have to "concern [himself] with issues related to any materialization of risk." A.1378.

In its class-certification order, the district court correctly rejected plaintiffs' new grounding theory as inconsistent with their prior reliance on a materialization-of-risk theory to defeat defendants' motion to dismiss. The court noted that "it was not clear from the face of the Amended Complaint that Plaintiffs were pursuing … a damages theory" based on an assumed grounding of the 737 MAX at the start of the class period. S.A.41. The court

also stressed that, in ruling on defendants' motion to dismiss, it had "allowed Plaintiffs to proceed with their claim that the Ethiopian Airlines Crash functioned as a corrective disclosure based on Plaintiffs' allegation that the crash was a 'materialization of the safety risks Defendants concealed.'" S.A.41. The court thus concluded that it "will not consider [a] damages model based on the assumption that the 737 MAX would have been grounded [if] Defendants had made proper disclosures." S.A.42.

The district court erred in later reconsidering this finding. "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole* v. *CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (quotation omitted). In seeking reconsideration, plaintiffs did not identify any "manifest errors of law" or "newly discovered evidence." The district court nevertheless granted reconsideration and acceded to plaintiffs' request to switch liability theories at class certification. That was error.

*Comcast*'s statement that a plaintiff's damages methodology must be consistent with its liability case requires a comparison with the liability theory that the plaintiff pleaded and relied on to defeat a motion to dismiss, not a brand new theory developed at class certification because the prior theory

creates challenges under Rule 23(b)(3). As the district court acknowledged, before class certification, the "focus" of plaintiffs' "theory as to the Ethiopian Airlines Crash [was] that the crash revealed *safety* risks allegedly concealed by Defendants' statements." S.A.74 (emphasis in original). Accordingly, in opposing defendants' motion to dismiss that alleged corrective disclosure, plaintiffs "stressed that the 'Ethiopian Airlines Crash … was a materialization of the safety risks Defendants concealed.'" S.A.74 (alteration in original); *see* A.389-391. And plaintiffs successfully defeated defendants' motion to dismiss based on that theory. A.447-450.

At class certification, however, plaintiffs' materialization-of-risk theory created significant challenges in devising a methodology for calculating classwide damages. As Dr. Garmaise explained, "when an alleged corrective disclosure takes the form of a materialization of an allegedly misstated risk, inflation is based on the difference between what the company knew and should have disclosed about the risk and what the market knew about the risk." A.1179. Inflation thus cannot be measured simply by "using [the] price declines after a corrective disclosure." A.1175. In this case, Dr. Garmaise noted, "[m]easuring public perceptions of this particular risk is complicated by the fact that … the mix of public information regarding the safety of the

737 MAX evolved between the start of the Proposed Class Period and the Ethiopian Airlines crash." A.1179-1180. Rather than confront these challenges at class certification, plaintiffs simply changed their theory for this alleged corrective disclosure. But *Comcast* does not permit plaintiffs to change horses midstream: they should be held to the theory that they pleaded and relied on to defeat a motion to dismiss.

In granting reconsideration, the district court accepted plaintiffs' argument that some modicum of support for their new grounding theory can be found in language in one sentence of one paragraph of the complaint—Paragraph 278. S.A.75. That paragraph states in relevant part:

> The Ethiopian Airlines Crash also revealed the true nature of the risks of (1) a catastrophic crash involving the 737 MAX and (2) regulatory action grounding the 737 MAX fleet.

A.235. But the district court never explained how "paragraph 278's allegation that the Ethiopian Airlines Crash 'revealed the true nature of the risk[] of … regulatory action grounding the 737 MAX fleet'" pleads that the 737 MAX would have been grounded at the start of the class period but for the alleged misstatements. S.A.75 (alteration in original). Paragraph 278 does not come close to saying that. Plaintiffs should not be allowed to jettison the liability theory that enabled them to survive defendants' motion to dismiss just because

they were able to find half of one sentence in their 195-page complaint that mentions "the risk[] of … regulatory action grounding the 737 MAX fleet." A.235.

The district court also concluded that, notwithstanding its prior ruling, plaintiffs' grounding theory "is consistent with the materialization of the risk framework." S.A.78. That conclusion cannot be reconciled with plaintiffs' own statements about their new grounding theory. When plaintiffs first raised that theory in their reply brief, they emphasized that "Dr. Tabak explained that a 'materialization of the risk' loss causation theory is *not* relevant to his expected damages model for the Ethiopian Airlines crash." A.1347 (emphasis added). Plaintiffs thus argued that "there is no class certification-relevant 'materialization of the risk' issue with which to contend." A.1348. Plaintiffs later reiterated that Dr. Tabak "did not plan to employ … a 'materialization of the risk' approach to calculating damages for the Ethiopian Airlines crash" and that Dr. Tabak "disagreed that [a] materialization of the risk analysis was necessary or appropriate in this Action." A.1449. These statements belie the district court's conclusion that Dr. Tabak's grounding theory "is consistent with the materialization of the risk framework." S.A.78.

By countenancing a switch in theories at class certification, the district court improperly allowed plaintiffs to "bob and weave pre-certification and not commit to" a theory until they have "the leverage of class certification to use as a sword in litigation." *Boeing*, 182 F.4th at 447. That is not permitted under *Comcast*. *See id.* at 443 ("We understand that litigants sometimes don't want to tip their hand. But at the class-certification stage, the plaintiffs had to.").

The district court blamed its "misunderstanding" at class certification on "Plaintiffs' failure to adequately explain the support behind [their] theory in the class certification briefing." S.A.78-79. Indeed, the court referenced plaintiffs' "unclean hands in the confusion" because their "motion for class certification was not as robust as" it should have been. S.A.79. These comments only underscore why plaintiffs should be held to their *Comcast* burden at class certification.

3. In any event, plaintiffs' belated grounding theory cannot satisfy *Comcast* because it applies to only one small portion of plaintiffs' overall case. Dr. Tabak's assumption that the 737 MAX would have been grounded at the start of the class period but for defendants' statements after the first accident is relevant to the calculation of damages arising out of only *one* of the five alleged corrective disclosures in this case—the Ethiopian Airlines accident.

*See* A.1502-1505, A.1565-1576, S.A.35-43. The grounding theory has no relevance at all to the calculation of damages arising out of the other four alleged corrective disclosures spread over the seven months after the Ethiopian Airlines accident, which is more than half the class period. *See* A.1576-1583, A.1585-1592. At class certification, plaintiffs offered no theory of liability for these later four alleged corrective disclosures other than their generic description of securities fraud. Without a liability theory, plaintiffs cannot "show that [any] methodology and the liability theory are sufficiently consistent" to satisfy *Comcast*. *Boeing*, 182 F.4th at 441.

### D. Plaintiffs' Efforts To Evade *Comcast*'s Requirements Are Unavailing.

1. In opposing this Court's review, plaintiffs argued that *Comcast* was "an antitrust case" with "four separate theories of harm" and that "[s]ecurities class actions … are different." No. 26-8007, Doc. 16 at 1-2, 12-13. This attempt to limit *Comcast* fails. In vacating class certification in another securities case for failure to apply "*Comcast*'s classwide-damages requirement," the Sixth Circuit stressed that "[w]e have applied *Comcast* outside the context of antitrust cases" and "we have also held that *Comcast*'s rigorous-analysis requirement applies to single-theory cases." *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 620 (6th Cir. 2025) (quotation

omitted). The Fourth Circuit likewise held that, "to the extent the applicability of *Comcast*" to securities actions is disputed, "*Comcast* applies." *Boeing*, 182 F.4th at 439 n.15. Simply put, *Comcast* interpreted Rule 23(b)(3)'s predominance requirement, which applies to *all* class actions—not just antitrust cases.

2. Plaintiffs also argued that their damages "approach is consistent with the well-established 'inflation maintenance' theory." No. 26-8007, Doc. 16 at 3. According to plaintiffs, "[a] damages model that maintains constant inflation … is entirely consistent" with such a theory. *Id.* at 17. This argument fails for two independent reasons.

First, plaintiffs provided no support for an inflation-maintenance theory at class certification. Their complaint simply asserts in passing that defendants' statements "artificially inflate[d] *or* maintain[ed] the existing artificial inflation" in Boeing's stock price. A.324 (emphasis added); *see id.* (referencing "artificial inflation caused *or* maintained by Defendants' misstatements") (emphasis added). But the complaint says nothing of substance to support those conclusory references to maintaining inflation. And at class certification, Dr. Tabak's reports provided *no* support for an

inflation-maintenance theory. He did not even mention that theory in his two reports in support of class certification.

Second, even if plaintiffs had provided some support for an inflation-maintenance theory, that would not mean that any inflation in Boeing's stock price remained constant between each alleged corrective disclosure. Whether alleged misstatements inflate a stock's price or maintain existing inflation in the price, that inflation still can vary over time. "In the real-world market, … stock prices respond to many different sources of information, often including both good and bad news about the company, and truths as well as the alleged falsehoods." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020). Plaintiffs here challenge dozens of different statements about different subjects made at different times over many months while the information available to the market about the 737 MAX and MCAS continued to evolve. Thus, even if they rely on an inflation-maintenance theory, plaintiffs still need a damages methodology that can account for variations in inflation over the class period. Simply incanting "inflation maintenance" does not solve their basic *Comcast* problem.

3. Plaintiffs also have argued that their submission of Dr. Tabak's merits report four days before the district court ruled on class certification

"mooted Defendants' *Comcast* arguments." No. 26-8017, Doc. 2 at 9. That contention is incorrect for multiple different reasons.

As an initial matter, the district court *denied* plaintiffs' motion for leave to supplement the class-certification record with Dr. Tabak's merits report and did not otherwise mention that report anywhere in its certification decision. S.A.23 n.6. It would be "inappropriate to let a class-certification decision stand based on a report which the district court didn't even consider in certifying a class in the first place." *Boeing*, 182 F.4th at 447.

Moreover, plaintiffs are wrong that the handful of later references to Dr. Tabak's merits report in the district court's reconsideration order somehow defeats defendants' *Comcast* arguments. No. 26-8017, Doc. 2 at 16-17. In seeking limited reconsideration, plaintiffs did not ask the district court to redo its *Comcast* analysis using Dr. Tabak's merits report. Consistent with plaintiffs' narrow request to reconsider a single finding, the reconsideration order's discussion of Dr. Tabak's merits report is limited to noting that, "[a]s both parties discuss[ed] in their reconsideration briefs," Dr. Tabak's merits report "does not include a damages model based on" a materialization-of-risk theory. S.A.80. The district court thus "reconsider[ed] its decision to allow Plaintiffs to proceed" on that theory. S.A.80. The

reconsideration order nowhere suggests that the district court relied on Dr. Tabak's merits report more broadly to reassess whether plaintiffs had satisfied *Comcast*.

More fundamentally, even Dr. Tabak's merits report, submitted after the close of fact discovery, is insufficient to satisfy *Comcast*. To be sure, Dr. Tabak finally committed in his merits report to a specific methodology for determining the alleged inflation in Boeing's stock price throughout the class period. Despite having assured the district court at class certification that he could develop a methodology that accounts for varying levels of inflation during the class period, A.1389, Dr. Tabak's merits report employs a constant-dollar measure of inflation, with no variations in the level of inflation between alleged corrective disclosures, A.1597-1601. Dr. Tabak's reliance on a constant-dollar measure of inflation "is inconsistent with the plaintiffs' theory of liability." *Boeing*, 182 F.4th at 448.

Plaintiffs here allege 32 different misstatements over a nearly one-year period that supposedly concealed a variety of different information. *See* A.293-322. At the motion-to-dismiss stage, plaintiffs contended that defendants' "safety" statements, made after both accidents, were material due to their repetition. *See* A.353, A.381-382. Under that theory, "the repetition

of [those] statements" would be expected to have a "cumulative," not constant, inflationary effect. *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). Dr. Garmaise also demonstrated that large amounts of information about the 737 MAX and MCAS became public over the seven months between the Ethiopian Airlines accident and the end of the class period that would have caused the level of any inflation in Boeing's stock price to vary. *See* A.1156-1161. As Dr. Garmaise explained, "[t]he evolving mix of public information would be expected to affect the economic and informational context for the alleged misrepresentations" and thus the level of any inflation in Boeing's stock price. A.1149.

In adopting a constant-dollar measure of inflation, Dr. Tabak failed to account for any of these features of the case. Indeed, his merits report offers *no* explanation for his decision to hold the dollar amount of any inflation in Boeing's stock price constant between the alleged corrective disclosures after the Ethiopian Airlines accident. *See* A.1576-1583, A.1585-1592. His report simply observes that those alleged corrective disclosures were associated with statistically significant declines in Boeing's stock price, and Dr. Tabak then uses those price declines as his measure of constant-dollar inflation. *See* A.1580, A.1582-1583, A.1587, A.1592.

As the Fourth Circuit held, "[i]t isn't consistent with [plaintiffs'] allegations to assert a damages methodology based on the conclusion that [defendants'] varying statements—of different kinds, at different points in time, with different industry and microeconomic conditions and with evolving investors' perceptions of the riskiness of a Boeing investment—would maintain the alleged fraud by an exact [amount] that never changes." *Boeing*, 182 F.4th at 448. "Conclusorily claiming that each statement had the exact same effect on the market is speculation, not a showing of consistency." *Id.*

## II. PLAINTIFFS FAILED TO PROVE THAT BOEING OPTIONS TRADED IN EFFICIENT MARKETS.

In an attempt to ratchet up damages even further, plaintiffs also included traders of Boeing put and call options in the proposed class. Should the Court reach the question, the district court erred in concluding that plaintiffs satisfied their burden to include options traders in the class.

To invoke the *Basic* presumption of reliance for options traders, plaintiffs were required to prove that all Boeing options traded in efficient markets during the class period. Without that presumption, "individualized issues of reliance" would defeat predominance under Rule 23(b)(3) and "preclude certification." *Goldman Sachs Grp., Inc.* v. *Ark. Tchrs. Ret. Sys.*, 594 U.S. 113, 119 (2021) (quotation omitted).

To demonstrate market efficiency for Boeing options, plaintiffs relied on Dr. Tabak's "put-call parity" test. A.491-492, A.1361-1362.[6] As Dr. Garmaise explained, however, an analysis of put-call parity alone cannot establish market efficiency. A.1205-1209, A.1522-1523. Even Dr. Tabak agreed this is "technically true," while noting that "efficiency can never be conclusively demonstrated." A.1404. But defendants never suggested that market efficiency must be "conclusively demonstrated." Their point was that Dr. Tabak relied on a single measure to assess market efficiency that is insufficient on its own.

Dr. Tabak's analysis also "glosses over the heterogeneity in Boeing's options." A.1198. "The Chicago Board Options Exchange listed 10,390 unique Boeing options over the Class Period." A.532. These options can be grouped into 5,195 distinct pairs of puts and calls with the same strike price and maturity date. A.532. The thousands of Boeing options that traded during the class period had strike prices ranging from $135 to $650 and maturity dates spanning from March 15, 2019 to January 21, 2022. A.1201. Dr. Tabak agreed

[6] Plaintiffs also argued that the fact that "Boeing common stock traded in an efficient market … is strong evidence that Boeing options also trade efficiently." A.1359. The parties' experts agreed, however, that option-market efficiency does not necessarily follow from stock-market efficiency. *See* A.981-983, A.1201-1205.

that these different options “trade[d] in different markets.” A.978-979. He also agreed that it is possible for the market for one option series to be efficient but the market for another to be inefficient, and for the market for a particular option series to be efficient at some points in time but inefficient at others. A.979-980. Yet Dr. Tabak based his put-call parity analysis on a subset of Boeing option series traded during the class period. A.534, A.1206.

In holding that plaintiffs sufficiently proved market efficiency based on Dr. Tabak’s put-call parity analysis, the district court committed two legal errors: (i) it failed to consider defendants’ arguments on the factors that courts and financial economists typically analyze in assessing market efficiency, and (ii) it refused to resolve the battle between the parties’ experts.

### A. The District Court Failed Even To Consider Defendants’ Arguments On Factors Relevant To Market Efficiency.

As Dr. Tabak acknowledged, “[t]o assess whether a market is efficient, financial economists and the courts have developed various tests.” A.505. One test is “the widely-accepted factors set forth in *Cammer*.” A.485. Another is the factors identified in *Krogman*. A.489-490. These tests “for gauging market efficiency have been used by many courts throughout the country.”

*Unger* v. *Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *accord In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017).[7]

Given their widespread acceptance, Dr. Tabak discussed each of the *Cammer* and *Krogman* factors in analyzing market efficiency for Boeing common stock. A.506-530. But he failed to consider those same factors in assessing efficiency for Boeing options, relying instead on his put-call parity analysis alone. A.530-537. That omission is notable and significant because several of the *Cammer* and *Krogman* factors undercut a finding of options efficiency in this case. *See* A.1209-1215, A.1523-1532.

1. *Cammer* Factor 1. In discussing Boeing common stock, Dr. Tabak noted that "a large weekly volume of stock trades" suggests "there is an efficient market … because it implies significant investor interest in the company." A.507 (quotation omitted). This factor does not support a finding of market efficiency for Boeing options. Dr. Garmaise demonstrated that "more than half of the [Boeing] option series had no reported volume on the majority of trading days." A.1210. Even on the dates of the alleged corrective

[7] The five *Cammer* factors are (1) trading volume, (2) analyst coverage, (3) the existence of market makers and arbitrageurs, (4) SEC Form S-3 eligibility, and (5) price response to news. The three *Krogman* factors are (1) market capitalization, (2) bid-ask spread, and (3) float. *See* A.506.

disclosures, Dr. Garmaise found that "a substantial portion of the options did not trade." A.1210-1211. "For example, 19.0% of the options in Dr. Tabak's sample were not traded on March 11, 2019, the day after the Ethiopian Airlines crash." A.1211.

2. *Krogman* Factor 2. In discussing Boeing common stock, Dr. Tabak stated that "[a] bid-ask spread can provide evidence regarding market efficiency because the spread provides information about the cost of arbitrage." A.525. Whereas a "narrow spread supports a finding of market efficiency," A.525, a wide bid-ask spread "may be viewed as an indicator counter to market efficiency," A.1408. This factor also does not support a finding of efficiency for Boeing options. Dr. Garmaise demonstrated that many Boeing options "were associated with relatively wide bid-ask spreads" during the class period. A.1211. In fact, the median bid-ask spreads in Dr. Tabak's options sample were more than *200 times wider* (in percentage terms) than the benchmark Dr. Tabak cites for Boeing stock. A.1211-1212. "Despite these findings, Dr. Tabak does not analyze actual bid-ask spread data for options." A.1212.

3. *Cammer* Factor 5. In his discussion of Boeing stock, Dr. Tabak emphasized that "'one of the most convincing ways to demonstrate efficiency

[is] to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.'" A.515. This factor, too, does not support a finding of efficiency for Boeing options. Dr. Garmaise found "examples of Boeing option prices moving in directions opposite to what would be expected based on Boeing's stock price movement." A.1213. He identified 29 trading dates (10.5% of the class period) in which at least 5% of Boeing put and call options that were at least $50 out of the money "move in the opposite direction from what one would expect based on the stock price movement." A.1214-1215. As Dr. Garmaise explained, this analysis is significant because it compares "actual Boeing stock price movements to actual Boeing option price movements." A.1527.

The district court, however, refused to "examine Defendants' arguments related to these factors." S.A.58. Citing two trial-court decisions, the court concluded that "the fact that options pass the put-call parity test [is] sufficient to establish options efficiency." S.A.56.[8] The court's failure even to consider

[8] In *In re Fibrogen Securities Litigation*, 2024 WL 1064665, at *17 (N.D. Cal. Mar. 11, 2024), the defendants did "not contest" options efficiency. As a result, their "expert d[id] not address the options market" or "counter" the plaintiffs' analysis. *Id.* In *Industriens Pensionsforsikring A/S* v. *Becton, Dickinson & Co.*, 2023 WL 4981716, at *6 (D.N.J. Aug. 3, 2023), the defendants challenged the plaintiff's put-call parity analysis but "offered no evidence" of inefficiency.

defendants' arguments related to these factors was error. In contrast, other courts have applied the *Cammer* and *Krogman* factors to options, even when a put-call parity analysis also was performed. *See*, *e.g.*, *Rougier* v. *Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *14 (S.D. Tex. Nov. 13, 2019); *Marcus* v. *J.C. Penney Co.*, 2016 WL 8604331, at *8-9 (E.D. Tex. Aug. 29, 2016); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 617-618 & n.94 (C.D. Cal. 2009). The district court should have done so here.

### B. The District Court Failed To Resolve The Battle Between The Parties' Experts At Class Certification.

Faced with competing opinions from the parties' experts on options efficiency, the district court "decline[d] to 'resolve this battle between the experts' at class certification." S.A.57. The court instead found that plaintiffs' evidence was sufficient to show market efficiency "for purposes of class certification." S.A.58. This was error under this Court's decisions.

In *West*, the district court similarly declined to resolve a "clash" between the parties' experts at class certification. 282 F.3d at 938. This Court reversed, holding that this "amounts to a delegation of judicial power to the plaintiffs, who can obtain class certification just by hiring a competent expert." *Id.* As this Court explained, "[a] district judge may not duck hard questions by observing that each side has some support, or that considerations relevant

to class certification also may affect the decision on the merits." *Id.* Rather, "[t]ough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *Id.*

This Court reached the same conclusion in *Arandell*. 149 F.4th 883. The district court there certified a class without resolving "the conflicting expert testimony." *Id.* at 887. The district court instead "deferred full engagement with those debates at the class certification stage, leaving further consideration for the merits of the case." *Id.* This Court vacated class certification, holding that "there is no shortcut that might let the district court avoid full engagement with the economic experts" at class certification. *Id.* at 895. This Court explained that, "[i]n the face of material disputes bearing on class certification, the trial court must receive evidence … and then resolve the disputes or choose between competing perspectives." *Id.* at 893. "Otherwise," this Court again noted, "any party would be able to obtain … class certification 'just by hiring a competent expert.'" *Id.* at 894 (quoting *West*, 282 F.3d at 938).

The district court here expressly "decline[d] to resolve th[e] battle between the experts at class certification." S.A.57 (quotation omitted). This

refusal to resolve a dispute on an issue bearing directly on the propriety of class certification was error under *West* and *Arandell*.

## CONCLUSION

Because plaintiffs have failed to satisfy their burden under *Comcast*, the district court's order certifying a class should be reversed. Should the Court reach the question, the district court's determination that plaintiffs satisfied their burden under *Basic* of proving that all Boeing options traded in efficient markets should be vacated.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Jeffrey B. Wall*

Jeffrey B. Wall
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jwall@gibsondunn.com

Richard C. Pepperman II
Benjamin R. Walker
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
peppermanr@sullcrom.com
walkerb@sullcrom.com

John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862-2000
john.hartmann@kirkland.com
brogers@kirkland.com

David N. Whalen
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500
whalend@sullcrom.com

Craig S. Primis, P.C.
Katherine R. Katz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
cprimis@kirkland.com
katherine.katz@kirkland.com

*Counsel for Defendants-Appellants*
*The Boeing Company and Dennis A. Muilenburg*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 13,851 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Century Expanded BT font.

*/s/ Jeffrey B. Wall*
Jeffrey B. Wall

Dated: September 28, 2026

## CERTIFICATE OF SERVICE

I certify that, on September 28, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

*/s/ Jeffrey B. Wall*
Jeffrey B. Wall

Dated: September 28, 2026

# Short Appendix

## CIRCUIT RULE 30(d) STATEMENT

I certify that all the materials required by Circuit Rule 30(a) and (b) are included in the Short Appendix and the Appendix submitted together with Defendants-Appellants' Brief.

*/s/ Jeffrey B. Wall*
Jeffrey B. Wall

Dated: September 28, 2026

## TABLE OF CONTENTS

*Page*

Dkt. 486, Memorandum Opinion and Order on Class Certification (Mar. 16, 2026) .......... S.A.1

Dkt. 515, Order on Motion for Limited Reconsideration (June 18, 2026) .......... S.A.63

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION | No. 19-cv-02394<br>Judge Franklin U. Valderrama |

## MEMORANDUM OPINION AND ORDER

In 2018 and 2019, Boeing's 737 MAX plane was involved in two fatal plane crashes. Following the crashes, Boeing's former President and CEO, Dennis Muilenburg, and its former CFO, Gregory Smith, made public statements in response to the crashes concerning, among other things, the safety of the 737 Max plane. Plaintiffs, a group of pension funds and private investors, sued Boeing, Muilenburg, (together, Defendants), and Smith,[1] on behalf of shareholders, under Section 10(b) of the Securities Exchange Act. R. 275, FAC.[2] Plaintiffs allege that Defendants made false and misleading comments with the intent to deceive investors in the wake of the two catastrophic plane crashes, which artificially inflated Boeing's stock price and caused injury to the putative class members. *Id.*

Before the Court is Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. R. 388, Mot. Class Cert. For the reasons stated below, the Court grants in part and denies Plaintiffs' motion for class certification.

[1]The Court granted Defendants' motion to dismiss in part on September 30, 2024 and dismissed all claims against Smith. R. 346, MTD Opinion.

[2]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

### I. The 737 MAX and MCAS

In August 2011, Boeing announced that it would develop the 737 MAX—an upgraded 737 model with more fuel-efficient engines. R. 388-1, Memo. Class Cert. at 3. However, because these upgraded engines were larger, they needed to be placed in front of the wings, meaning the plane's nose tended to "pitch up" in flight and the tail end would drop, causing the plane to stall. *Id.* Instead of making structural changes to compensate for the issues caused by the larger engines, Boeing installed an automated system on the 737 MAX called the Maneuvering Characteristics Augmentation System (MCAS) into the plane's flight control systems. *Id.* MCAS would detect if this "pitch up" situation occurred and drive the nose down. *Id.* This fix, however, posed a serious safety risk if MCAS activated erroneously. *Id.* During development, according to Plaintiffs, Boeing dramatically increased the risk of erroneous activation causing a plane crash by: (1) implementing a rare "single point of failure" trigger for MCAS; (2) expanding MCAS's authority to seize control of the plane in both low- and high-speed environments; and (3) expanding its authority by more than 300%. *Id.*

Boeing's primary directive with the 737 MAX was to expedite Federal Aviation Administration (FAA) approval of the plane by amending the "type" certificate for the original 737, rather than seeking new certification. Memo. Class Cert. at 3. This provided a faster road to certification and also allowed Boeing to claim to potential customers that the 737 MAX needed only minimal training requirements. *Id.* To

accomplish this goal, Plaintiffs claim that Boeing misled the FAA, including by submitting a hazard analysis based on the false premises that pilots would be able to respond to erroneous MCAS activation in less than four seconds—even though Boeing knew one of its own test pilots took more than ***ten seconds*** during a simulation, which would have "catastrophic" results in real flights—and that MCAS would only activate during "more strenuous flight operations." *Id.* at 3–4. In reality and contrary to what Boeing reported to the FAA, however, Boeing's undisclosed modifications allowed MCAS to activate under conditions "well within the normal flight envelope." *Id.* at 4. The 737 MAX's Chief Technical Pilot Mark Forkner (Forkner) helped ensure that the FAA required minimal training and that all references to MCAS were removed from the flight manuals provided to pilots; he ultimately bragged in internal text messages and emails that he "jedi-mind trick[ed]" the FAA. *Id.* As a result, pilots did not even know MCAS existed prior to the first 737 MAX crash. *Id.*

## II. The Lion Air Crash

On October 29, 2018, MCAS erroneously activated on Lion Air flight JT 610 and caused it to crash, killing 189 people (the Lion Air Crash). Memo. Class Cert. at 4. While early public speculation pointed to Lion Air, which was a budget airline with a "mixed safety record" and "checkered past," by November 4, 2018, Boeing's Safety Review Board (the SRB) identified erroneous MCAS activation as a serious "safety issue" and found that multiple MCAS activations could force the plane into a fatal dive that pilots could not correct; the same report concluded that "[m]ultiple failure indications can lead to pilot confusion, delaying appropriate response" until it was too

late. *Id.*; FAC ¶¶ 199–200. The SRB met again on November 6, 2018, and concluded that erroneous MCAS activation warranted Boeing's highest safety emergency classification. Memo. Class Cert. at 4. The same day, Boeing's Chief Engineer John Hamilton—who briefed Defendant Muilenburg up to twice daily—learned that when MCAS is activated, "the stabilizer can be commanded well beyond the electric stabilizer limit . . . . [T]here's no way that you can control that." *Id.* at 4–5.

The FAA also directed Boeing to take "urgent action" to address erroneous MCAS activation, which the agency found could, if not remedied, ultimately cause up to 76 crashes and more than 14,000 deaths. Memo. Class Cert. at 5. The FAA issued a "mandate" to fix MCAS, although Muilenburg personally ensured Boeing did not disclose this mandate to the public. *Id.* at 5. Internally, Boeing engineers reported to senior executives that MCAS had not been adequately tested during the original certification process, and the limited testing performed after the crash showed the airplane far exceeded FAA safety tolerances. *Id.*

Still, even with this knowledge, Defendants sought to assure the public that the 737 MAX was safe and that it was the pilots who were at fault in the Lion Air Crash. Memo. Class Cert. at 5. Muilenburg personally instructed Boeing executives to be "tightly coordinated" regarding Defendants' public statements about the 737 MAX. *Id.* On the first day of the Class Period, November 7, 2018, Boeing issued a press release stating that it had issued a bulletin to flight crews on November 6, which directed flight crews to "existing flight crew procedures to address circumstances where there is erroneous input from an AOA sensor." *Id.*; FAC ¶ 239.

Muilenburg coupled these statements with a repeated insistence that "the 737 MAX is a safe airplane" and that it was "as safe as any airplane that has ever flown the skies." Memo. Class Cert. at 5.

## III. The Ethiopian Airlines Crash

Nearly five months after the Lion Air Crash, on March 10, 2019, Ethiopian Airlines flight ET 302, a 737 MAX flight, crashed minutes after takeoff (the Ethiopian Airlines Crash). Memo. Class Cert. at 5. Within minutes of takeoff, MCAS erroneously activated again. *Id.* Although the pilots followed "existing flight procedures," they were unaware that one of those procedures would not work at all, while the other had to be implemented within just 10 seconds to have a chance of working, because thereafter the downward pressure would be too strong to mitigate. *Id.* As a result, the pilots were unable to stop the plane from crashing, killing all 157 people on board. *Id.* at 5–6; FAC ¶ 272. After this crash, regulators around the world grounded the 737 MAX. Memo. Class Cert. at 6.

Analysts immediately questioned the 737 MAX's safety and the similarities between the Ethiopian Airlines Crash and the Lion Air Crash. Memo. Class Cert. at 6. In response to the Ethiopian Airlines Crash and its apparent similarities to the Lion Air Crash, Boeing's stock declined $47.13 per share—a loss of $26.63 billion of Boeing market capitalization. *Id.*

In the days after the Ethiopian Airlines crash, news outlets began reporting on the potential issues with MCAS. For example, on March 17, 2019, the Seattle Times published an investigative report that detailed safety issues with the 737 MAX based

on interviews with current and former Boeing engineers. Memo. Class Cert. at 6. On March 21, 2019, *The New York Times* revealed that the planes that crashed lacked certain safety features because Boeing made them optional and charged extra for them. *Id.* Boeing's stock price declined materially after both of these articles. *Id.*

Defendants continued defending the 737 MAX's FAA certification, stating that there was "no technical slip or gap" in the "high-integrity process," even though they were fully aware of numerous deficiencies, including that Forkner, by his own admission, "lied" to the FAA about the dangers posed by the MCAS system. Memo. Class Cert. at 6. Defendants also provided unrealistically short timelines for the MAX's return to service, such as reporting "the end of summer 2019" as the "timeframe" on June 26, 2019, and then "early in the fourth quarter" on July 18, 2019, and specifying "September" a week later on July 24, 2019. *Id.* at 6–7. Defendants made these claims even after, among other things, FAA Administrator Daniel Elwell personally directed Defendant Muilenburg in a June 2019 meeting to "slow down [Boeing's] talk of progress." *Id.* at 7.

On June 26, 2019, the FAA announced that it had discovered a "potential risk" related to MCAS software "that Boeing [had to] mitigate" before the FAA would recertify the MAX—thus revealing that the plane's safety problems were more severe than previously known and belying any hopes that the safety issues could be addressed with a "simple MCAS software fix that would not involve significant engineering labor on the existing MAX fleet." Memo. Class Cert. at 7. Then, on July 24, 2019, Defendant Muilenburg announced that Boeing "might need to consider . . .

a temporary shutdown of the MAX production"—contradicting Defendants' earlier statements touting the prospect of the MAX's near-term return to service. *Id.* Boeing's stock price again declined substantially. *Id.*

On October 18, 2019, a *New York Times* article disclosed to the public Forkner's text messages, including one describing MCAS as "running rampant"—messages that, among other things, confirmed that there were safety issues with the plane that "existing procedures" could not remedy and that the certification process had been anything but "high integrity." Memo. Class Cert. at 7. These revelations invited intense scrutiny from the markets, lawmakers, and regulators and Boeing stock declined more than $25 per share. *Id.*

Finally, on December 16, 2019, Boeing announced that it was suspending production on the 737 MAX. Memo. Class Cert. at 7. Boeing shares dropped $14.67 per share the next day, a 4.3% decline. *Id.* at 8. All told, Boeing shares declined nearly 27% from their Class Period high of $446.01 to $327.00 on December 17, 2019. *Id.*

Defendants have since faced numerous investigations based on their misconduct concerning the 737 MAX's safety and certification. For example, Boeing paid $200 million and Defendant Muilenburg paid $1 million (out of his own pocket) to resolve charges with the Securities and Exchange Commission (SEC) for "materially misleading" Boeing's investors by claiming that the 737 MAX was "as safe as any airplane that has ever flown the skies" and that "there was no surprise or gap or unknown . . . that somehow slipped through [the] certification process" for the 737 MAX. Memo. Class Cert. at 8. Further, in Boeing's January 2021 Deferred

Prosecution Agreement (DPA) with the Department of Justice (DOJ), Boeing admitted that the 737 MAX's flight manual was "materially false, inaccurate, and incomplete" and that it had "intentionally withheld and concealed from the FAA" its "knowledge of MCAS's expanded operational scope." *Id.* Boeing paid $2.5 billion to settle the DOJ's claims. *Id.* On July 24, 2024, the DOJ and Boeing jointly submitted a plea agreement wherein Boeing pled guilty to "breach[ing] the terms of the DPA by failing to sufficiently design, implement, and enforce a compliance and ethics program to prevent and detect violations of the U.S. fraud laws throughout its operations." *Id.* (citing *United States of America v. The Boeing Company*, No. 4:21-cr-00005-O Dkt. No. 221-1 (N.D. Tex. July 24, 2024)).

Plaintiffs, individually and on behalf of a class of similarly situated individuals, sued Defendants, asserting claims for securities fraud under Section 10(b) of the Securities Exchange Act, alleging that Defendants misrepresented the safety of the 737 MAX to the investing public, which artificially inflated Boeing's stock price and caused injury to the putative class member. FAC. Following the Court's ruling on Defendants' motion to dismiss the FAC, six disclosures that Plaintiffs contend corrected Defendants' alleged misstatements remain in the case: (1) The Ethiopian Airlines Crash on March 10, 2019, which corrected Defendants' statements following the Lion Air Crash about the safety of the 737 MAX, Am. Compl. ¶ 525; (2) A *Seattle Times* article on March 17, 2019, that supposedly "revealed several fundamental flaws in the MAX's safety analysis and design," Am. Compl. ¶ 525; (3) A *New York Times* article on March 21, 2019, reporting that Boeing had not

included certain software on the 737 MAX airplanes involved in the Lion Air and Ethiopian Airlines accidents, Am. Compl. ¶ 525; Dkt. No. 346 at 50; (4) Boeing's July 24, 2019 announcement before the market's open that the protracted grounding of the 737 MAX could result in a temporary halt of production for the plane if the delays continued, Am. Compl. ¶¶ 317–22, 525; (5) A *New York Times* article on October 18, 2019, that published certain text messages involving 737 Chief Technical Pilot Mark Forkner, Am. Compl. ¶ 525; and (6) Boeing's announcement on December 16, 2019, that it was temporarily halting production of the 737 MAX, Am. Compl. ¶ 525.[3] Before the Court is Plaintiffs' motion for class certification.

## Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 348 (2011) (cleaned up).[4] To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *Harper v. Sheriff of Cook County*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). In addition to the four Rule 23(a) requirements, a proposed class must also satisfy

[3]Plaintiffs' Appendix A to their motion for class certification lists seven corrective disclosures. *See* Memo. Class Cert at 8 n.3; R. 388-2, Appx. A. The Court dismissed one of the listed disclosures, however, in its September 30, 2024 Order granting in part Defendants' motion to dismiss. MTD Opinion. Specifically, the Court dismissed the claims based on the FAA's June 26, 2019 announcement that the FAA's testing revealed a MCAS software flaw. *Id.* at 56.

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

one of the subsections in Rule 23(b): that "common questions of law or fact predominate over individual ones and that a class action is superior to other methods of adjudicating the case." *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 597 (7th Cir. 2021) (cleaned up). The named plaintiff bears the burden of proving by a preponderance of the evidence that their proposed class satisfies the requirements of Rule 23. *Id.*

In evaluating Plaintiffs' motion, the Court need not assume the truth of Plaintiffs' assertions and is free to "receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate." *Messner v. Northshore Unv. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). That said, courts "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Id.* "Merit questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Jacks v. DirectSat USA, LLC,* 118 F.4th 888, 895 (7th Cir. 2024) (cleaned up). "A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Id.* (cleaned up).

**Analysis**

Plaintiffs seek to certify the following class: all persons or entities who purchased or otherwise acquired Boeing common stock and/or call options or sold put options between November 7, 2018 and December 16, 2019, inclusive (the Class Period) and were damaged thereby (the Class). Defendants argue against

certification, challenging predominance on the basis of Plaintiffs' classwide damages methodology, and in the alternative, in the event that a class is certified, challenging the end date of the Class Period and the inclusion of option traders in the Class. R. 418, Resp.

An implicit requirement under Rule 23 is that a class be "defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Here, the class is readily ascertainable—and Defendants do not argue otherwise—as it is clear and membership is based on objective, as opposed to subjective, criteria. The Court now turns to the Rule 23(a) requirements.

## I. Rule 23(a)

### A. Numerosity

Rule 23(a)'s first requirement is numerosity. Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 860 (7th Cir. 2017).

Plaintiffs maintain that they satisfy this requirement, and Defendants do not disagree. During the Class Period, Boeing had over 560 million shares outstanding, with a weekly trading volume of over 20 million shares. Memo. Class Cert. at 10 (citing R. 388-4, Tabak Rpt. ¶ 17; *id.*, Exh. 7a; *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *2 (N.D. Ill. Feb. 26, 2020) (weekly

trading volume of 4 million shares sufficient)). The Court finds that Plaintiffs have satisfied the numerosity requirement, as there is evidence that the class would consist of well over forty members and that joinder of all members would be impracticable.

**B. Commonality**

Rule 23(a)'s second requirement is that there exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A court need only find a single common question of law or fact, the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough." *Chi. Teachers Union, Local No. 1 v. Bd. of Ed. of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015) (cleaned up). Rather, "[t]he claims must depend upon a common contention that is capable of class-wide resolution." *Id.* "A common nucleus of operative fact is usually enough to satisfy" this requirement. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The Seventh Circuit has instructed courts to "begin the class certification analysis by identifying the elements of the plaintiff's various claims." *Eddlemon v. Bradley Univ.*, 65 F. 4th 335, 339 (7th Cir. 2023) (cleaned up).

To bring a claim for securities fraud under Section 10(b), a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by &*

*through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)).

Plaintiffs maintain that common questions here include "whether Defendants' statements were materially false or misleading, whether Defendants acted with scienter, and whether the market price of Boeing's common stock and call options were artificially inflated due to the alleged conduct by Defendants." Memo. Class Cert. at 11 (citing FAC ¶ 535; *In re Anicom Inc. Sec. Litig.*, 2002 WL 472249, at *2 (N.D. Ill. Mar. 27, 2002); *TreeHouse*, 2020 WL 919249, at *3).

Defendants do not challenge the commonality requirement.[5] No matter, as the Court must still ensure that Rule 23(a)'s requirements are met to "protect[] absent class members whose rights may be affected by the class certification." *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003). The Court agrees with Plaintiffs that they satisfy Rule 23's commonality requirement: the claims of the named Plaintiffs arise from the same conduct that gives rise to all claims in the putative class, and indeed, is the same kind of conduct that other courts in this District have found to have satisfied the commonality requirement in securities fraud actions. *See In re Hartmarx Sec. Litig.*, 2002 WL 31103491, at *4 (N.D. Ill. Sept. 19, 2002); *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565–66 (N.D. Ill. 2004). The questions are common to the Class and "determination of [the common questions'] truth or falsity

---

[5] To the extent that Defendants' arguments relating to damages calculation, options traders, and end date of the Class Period implicate the commonality requirement, the Court addresses those arguments below as they pertain to predominance, as that is how Defendants framed them. Outside of those issues, the Court sees no reason to question commonality and finds this factor satisfied. So too with typicality, below.

will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

**C. Typicality**

Rule 23(a)'s third requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *Oshana,* 472 F.3d at 514 (cleaned up). "Although the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members, the requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *McFields v. Dart*, 982 F.3d 511, 518 (7th Cir. 2020) (cleaned up). The Seventh Circuit has explained that "[t]he logic behind the typicality requirement is that a class representative will adequately pursue her own claims, and if those claims are typical of those of the rest of the class, then her pursuit of her own interest will necessarily benefit the class as well." *Howard*, 989 F.3d at 605 (cleaned up). "[T]he typicality requirement is liberally construed." *Dennis v. Greatland Home Health Servs., Inc.*, 591 F. Supp. 3d 320, 328 (N.D. Ill. 2022).

According to Plaintiffs, they satisfy the typicality requirement, as Plaintiffs, like the other Class members, allege that Defendants made material representations and omissions during the Class Period, including about the safety of the 737 MAX,

the adequacy of information provided to 737 MAX pilots in order to address erroneous MCAS activation, the integrity of the certification process for the 737 MAX, and the timeline for the 737 MAX's return to service. Memo. Class Cert. at 12. Similarly, Plaintiffs contend that they, like the other Class members, were injured by purchasing or acquiring Boeing common stock and/or call options at prices that were artificially inflated by Defendants' fraud and/or wrote Boeing put options at artificially deflated prices, which artificial inflation/deflation was removed from the stock when the true facts became known. *Id.* (citing FAC ¶ 543; *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. at 566).

Like commonality, Defendants do not attack typicality. And, like the commonality requirement, the Court also finds that Plaintiffs have satisfied the typicality requirement, as Plaintiffs' claims arise from the same core events and fraudulent course of conduct that gives rise to the claims of all other Class members, and all claims are based on the same legal theory.

**D. Adequacy**

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy "inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). A named plaintiff is ordinarily

considered to be adequate so long as her claims neither conflict with nor are antagonistic to those of other class members. *Howard*, 989 F.3d at 609–10.

Plaintiffs insist that they satisfy both prongs of the adequacy requirement. Memo. Class Cert. at 12–14. Again, Defendants do not challenge this requirement, but the Court nonetheless briefly addresses it. *See Davis*, 321 F.3d at 649.

Starting with the named Plaintiffs, as discussed above, the Court agrees with Plaintiffs that they assert the same claims and injuries as the other Class members, and thus do not have "antagonistic or conflicting claims." Memo. Class Cert. at 12–13 (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); citing *In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014)). Moreover, Plaintiffs have submitted declarations from individuals authorized to make declarations on behalf of named Plaintiffs demonstrating that Plaintiffs understand their fiduciary duties to the Class, and Plaintiffs have demonstrated their commitment to "fairly and adequately protect the interests of the class" by vigorously prosecuting this action on behalf of themselves and all other class members over at least five years. *Id.* at 13 (citing Exhs. 388-5, Ryals Decl.; 388-6, Marciano Decl.; 388-7, Houser Decl.; 388-8, Kegley Sr. Decl.; 388-9, Taggart Decl.; *Groupon*, 2014 WL 5245387, at *2). The Court finds that Plaintiffs are adequate class representatives.

Turning to Class counsel, Rule 23 also requires that "class counsel [] be experienced and competent." *TreeHouse*, 2020 WL 919249, at *3. In determining the adequacy of class counsel, the Court considers "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the

resources counsel will commit to the case." *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(A)). Here, Plaintiffs are represented by Bernstein Litowitz Berger & Grossman LLP (Bernstein Litowitz), as well as Kessler Topaz Meltzer & Check, LLP, which Bernstein Litowitz enlisted as additional counsel for the Class. Memo. Class Cert. at 13 & n.4. As Plaintiffs point out, Bernstein Litowitz has already "committed substantial time and effort" to prosecuting this action and has achieved successful results of Plaintiffs, including but not limited to their work drafting a consolidated complaint, an amended complaint, and two oppositions to Defendants' motions to dismiss, which were denied in large part, as well as counsel's significant discovery efforts. Memo. Class Cert. at 13–14 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 602 (N.D. Ill. 2009); *TreeHouse*, 2020 WL 919249, at *3). Additionally, Kessler Topaz has participated in the litigation throughout, and has been found by other courts to be "highly qualified" and "skilled in shareholder and transactional litigation." *Id.* at 13–14 n.4 (quoting *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2013 WL 3486990, at *2 (S.D.N.Y. Jul. 11, 2013); *Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at *6 (S.D. Ohio Aug. 5, 2016)). The Court concludes that Class counsel is adequate.

## II. Rule 23(b)

Once Rule 23(a) is satisfied, a class action may only be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court addresses both the predominance and superiority questions in turn.

**A. Predominance**

"The predominance requirement is similar to the commonality and typicality requirements, but far more demanding." *Amchem Prod., Inc., v. Windsor,* 521 U.S. 591, 623–24 (1997). "The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Santiago v. City of Chi.*, 19 F.4th 1010, 1016 (7th Cir. 2021). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* (cleaned up). "A common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 892 (7th Cir. Aug 5, 2025) (cleaned up). An individual question, on the other hand, is one where the "members of a proposed class will need to present evidence that varies from member to member." *Id.* As the Seventh Circuit has explained, "this inquiry focuses on whether a proposed class is sufficiently cohesive to warrant adjudication by representation." *Id.* (cleaned up). The predominance analysis turns on the elements of the underlying cause of action. *Mish Int'l Monetary Inc. v. Vegas Cap. London, Ltd.*, 2025 WL 1744895, at *8 (N.D. Ill. June 25, 2025). As with commonality, so too with predominance the Seventh Circuit

has instructed courts to "begin the class certification analysis by identifying the elements of the plaintiff's various claims." *Eddlemon*, 65 F. 4th at 339 (cleaned up).

"Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Messner*, 669 F.3d at 815 (quoting *Amchem*, 521 U.S. at 625); *see also Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("Falsehood and materiality are issues on the merits; whether a statement is materially false is a question common to all class members and therefore may be resolved on a class-wide basis after certification."). Still, the Court must conduct "a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). At the very least, "[t]hat requires matching the theory of liability to the theory of damages." *In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir. 2014) (explaining that plaintiffs may proceed on one of two damages theories); *see also Comcast*, 521 U.S. at 38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (cleaned up) (emphases in original). It would, however, put "the cart before the horse to insist" that plaintiffs demonstrate that the proposed method will precisely and accurately prove their damages "before any class can be certified." *Schleicher*, 618, F.3d at 687. Plaintiffs, therefore, "are not required to prove" all of the elements of a Rule 10b-5 claim "at the class-certification stage"; they need only show "that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen*

*Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 468–69 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).

Similar to the requirements above, Plaintiffs argue that, like most securities fraud class actions, Defendants' material misrepresentations during the Class Period affected all Class members and therefore proof of the violations, "including evidence of falsity, materiality, scienter, and loss causation, will "be made on a class-wide basis." Memo. Class Cert. at 15 (quoting *Schleicher*, 618 F.3d at 685, 686–87; citing, *inter alia*, *In re Bank One Sec. Litig./First Chicago S'holder Claims*, 2002 WL 989454, at *7 (N.D. Ill. May 14, 2002) ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue.")).

Relatedly, Plaintiffs maintain that common issues of damages predominate over individual issues, as damages for Plaintiffs' and the Class members' Section 10(b) claims are measured using the well-settled and commonly used "out-of-pocket" methodology, which fits Plaintiffs' theory of liability. Memo. Class Cert. at 15–16 (citing Tabak Rpt. ¶¶ 82–88; *Treehouse*, 2020 WL 919249, at *9 ("the theory of liability matches the theory of damages" where plaintiffs proposed out-of-pocket methodology based on event study); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (describing the "out-of-pocket, or event study, method" as the "standard method for calculating damages in virtually every Section 10(b) class action.")).

The way Plaintiffs see it, common issues of reliance predominate based on the fraud-on-the market presumption, which provides that that "a public, material

misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Memo. Class Cert. at 16 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283–84 (2014) (*Halliburton II*); citing *Groupon*, 2014 WL 5245387, at *2). Therefore, note Plaintiffs, a showing that Boeing's securities traded "in a generally efficient market" triggers a class-wide presumption of reliance as articulated in *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (the *Basic* presumption). *Id.* Boeing stock traded in an efficient market, argue Plaintiffs, as they traded on a presumptively "efficient" major securities exchange like the New York Stock Exchange and had daily trading volume over four million shares per day, a volume that the Seventh Circuit has found to "comfortably qualify" for the *Basic* presumption. Memo. Class Cert at 16–17 (citing *Schleicher*, 618 F.3d at 682; *Groupon*, 2014 WL 5245387, at *2).

Moreover, argue Plaintiffs, Boeing's common stock and options satisfy the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the *Cammer* factors), which are widely accepted, including by courts in this District, to demonstrate market efficiency. Memo. Class Cert. at 17 (citing *Groupon*, 2014 WL 5245387, at *3; *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 n.30 (2d Cir. 2017)). The *Cammer* factors are: "(1) average weekly trading volume during the class period; (2) number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled to file an S-3 Registration Statement; and (5) whether empirical facts demonstrate a cause-

and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Groupon*, 2015 WL 1043321, at *3. Plaintiffs need not demonstrate that all of the *Cammer* factors are satisfied to show market efficiency because these factors are an "analytical tool," not a "checklist." *Waggoner*, 875 F.3d at 99 n.30 (collecting cases). Defendants do not take issue with the efficiency of the market as to Boeing common stock. *See* Resp. Accordingly, the Court does not engage with Plaintiffs' analysis of each *Cammer* factor or the additional factors relating to market efficiency examined by Plaintiffs under *Krogman v. Sterritt,* 202 F.R.D. 467, 477–78 (N.D. Tex. 2001) (the *Krogman* factors). Memo. Class Cert. at 17–24. The Court addresses the parties' arguments regarding the efficiency of the market as to Boeing's options below. *See infra* Section II.A.3.

Defendants challenge predominance on three bases: (1) Plaintiffs have not satisfied their evidentiary burden under *Comcast*, 569 U.S. 27, 33, 35 to provide "evidentiary proof" of a classwide damages methodology consistent with their liability case; (2) Plaintiffs have not met their burden of proving by a preponderance of the evidence that the December 16, 2019 announcement temporarily halting production of the 737 MAX should mark the end of the Class Period, and therefore if any class is certified, the Class Period should end on October 18, 2019; (3) if a class is certified, it should not include options traders. Resp. The Court addresses each argument in turn, starting with Plaintiffs' damages methodology.

### 1. Damages Methodology[6]

To set the stage, some context is required. In securities fraud litigation, 15 U.S.C § 78u-4 "enables plaintiffs to recover damages based on their economic losses." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 604 (7th Cir. 2020). "In its simplest form, a plaintiff's economic loss is the difference between the amount she paid to buy the security (higher than it should have been, in successful 10b-5 cases) and the amount she received when she sold it." *Id.* at 604–05. As the Seventh Circuit explained, "[f]or publicly traded securities, individual loss can be a simple arithmetic calculation using common evidence about the security's price movements over the relevant time." *Id.* at 605. In short, the correct measure of damages in a Rule 10(b)-5 case is out-of-pocket loss. Establishing loss in the context of publicly traded securities is challenging. These securities have established market prices, and even if that price is artificially inflated due to fraud, no investor experiences an economic loss until the price drops.

In *Comcast*, the plaintiffs alleged that Comcast engaged in unlawful, anticompetitive conduct to monopolize the cable television market in the Philadelphia area. Comcast, 569 U.S. at 29–30. The plaintiffs advanced four theories to support their antitrust claims, but the district court only certified the class action as to one theory: that Comcast acquired a significant share of the Philadelphia area, which

[6]On March 12, 2026, Plaintiffs filed a motion for leave to supplement the class certification record with Dr. Tabak's "full merits damages report" in which he calculates loss causation and damages for Boeing's common stock and options throughout the Class Period. R. 483, Mot. Leave Suppl. According to Plaintiffs, the supplemental report moots Defendants' arguments about Dr. Tabak's methodology not satisfying *Comcast*'s requirement that plaintiffs demonstrate damages can be calculated on a classwide basis consistent with their liability theory. *Id.* ¶¶ 6–7. The Court finds that the proposed supplemental report does not change the Court's analysis, and therefore denies the motion as moot.

unlawfully deterred competitors, or "overbuilders," from entering the market. *Id*. at 31. The district court certified a class finding that "damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis," even though the plaintiffs' expert acknowledged that his damages model did not isolate damages resulting from any one of the four theories of liability. *Id*. at 31–32. The Supreme Court reversed. The Court concluded that that the plaintiffs' damages model was insufficient to establish predominance because the model did not isolate the impact of overbuilder deterrence theory from the other three antitrust theories of liability proposed by the plaintiffs. *Id* at 37–38. Put differently, the model calculated damages that were not caused by the defendant's conduct. *Id*. at 36–37.

Here, Plaintiffs' expert, Dr. David Tabak stated in his expert report that, to calculate classwide damages, he will employ an event study to measure the amount of artificial inflation in Boeing stock, which traded in an efficient market on each day of the Class Period. Tabak Rpt. ¶¶ 8–87. The event study "account[s] for changes in market and/or industry effects, on the dates of (or the trading dates following) the (remaining) corrective disclosures alleged in this case." *Id.* ¶ 85. Dr. Tabak then plans to use the event study to analyze the alleged corrective disclosures and alleged false and misleading statements to "determine how much artificial inflation entered and exited from Boeing's stock price on different dates during the Class Period. This analysis is conducted on a class-wide basis." *Id.* Then, Dr. Tabak would review "the alleged corrective disclosures to determine whether any of the information disclosed on the Event Dates was unrelated to the remaining allegations." *Id*. ¶ 86. According

to Plaintiffs, by using the out-of-pocket methodology and standard economic tools, Dr. Tabak will be able to disaggregate, or separate, the impact on Boeing's stock price of fraud-related information from any impact of non-fraud-related information. *Id.* All-in-all, documents produced by Defendants in discovery and deposition testimony "should aid in some of the exact parameterizations of the damages calculations, a method for determining inflation at any date, and thus damages for any Class member, will be feasible." *Id.* ¶ 87.

Defendants challenge Dr. Tabak's discussion of classwide damages for three reasons: (1) Dr. Tabak does not provide a methodology for measuring per-share inflation on a classwide basis; (2) Dr. Tabak fails to show that his damages methodology is consistent with Plaintiffs' liability theory; and (3) Dr. Tabak's "out-of-pocket" formula does not account for the evolving information about Boeing that became public during the Class Period. Resp. at 12–13. The Court begins with Defendants' first and third arguments.[7]

Defendants argue that while the "formula cited by Dr. Tabak is the *legal standard* for measuring damages for Section 10(b) claims; it is not a *methodology* for calculating damages in any particular case." Resp. at 13 (emphases in original). Put another way, Defendants contend that Dr. Tabak merely sets forth a standard, non-

[7]The Court finds that Plaintiffs do not raise new arguments or rely on Dr. Tabak's Reply Report in their Reply in relation to these arguments, and therefore the Court does not consider Defendants' Sur-Response here. *See* R. 480, 1/22/2026 Minute Entry ("The Court will consider those portions of Defendants' sur-response and sur-rebuttal expert report that are responsive to arguments or evidence included in Plaintiffs' reply that could have and should have been raised in their opening brief; however, it will not consider the portions that simply give Defendants a second bite at the apple as to arguments in Plaintiffs' reply that are merely responsive to arguments raised in Defendants' response.").

specific methodology for calculating damages without any specifics for this case, which, according to Defendants, is insufficient under *Comcast*. *Id.* Specifically, assert Defendants, although Dr. Tabak admits that the out-of-pocket measure of damages cannot be applied without first measuring "the amount of artificial inflation in the stock" on each trading day during the Class Period, Dr. Tabak has not provided an actual damages model to measure the inflation in Boeing's stock prices during the Class Period. *Id.* at 13–14 (quoting Tabak Rpt. ¶¶ 84, 87). Dr. Tabak, according to Defendants, even admitted during his deposition that he "copied and pasted" his damages opinion in this case from reports he has submitted in support of class certification in other cases. *Id.* at 14 (quoting R. 418-2, Tabak Dep. at 111:21–112:4). Worse, argue Defendants, Dr. Tabak himself has authored an article that "attempts to provide a framework for thinking about which inflation measures may apply in different situations," yet his report does not mention any framework for doing so in this case. *Id.* at 15 (citing R. 418-16 at 1, 18). Defendants insist that under *Comcast*, it is not enough for Dr. Tabak to assert that he will be able to develop a model at some point in the future. Resp. at 13–14 (citing *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019); *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253–54 (6th Cir. 2024) (expert's "bald statement alone" cannot "prove" that Rule 23's requirements "have been met"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification."); *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018)).

Plaintiffs counter that contrary to Defendants' contention, their proposed methodology satisfies *Comcast*. R. 434, Reply at 3. The way Plaintiffs see it, all that *Comcast* requires is that damages are the result of the class-wide injury the plaintiff alleges. *Id*. (citing *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799 (2013)). In fact, assert Plaintiffs, securities class actions, unlike antitrust cases, lend themselves to class wide damages. *Id*. Turning to Dr. Tabak's out-of-pocket damages methodology, that methodology, assert Plaintiffs, is a well-accepted methodology to calculate Class damages. *Id.* at 4. The Court agrees.

As stated above, Plaintiffs correctly emphasize that the out-of-pocket, or event study,[8] method of measuring damages in Section 10(b) securities cases is widely accepted by courts nationwide, and indeed, has been endorsed by the Supreme Court. Memo. Class Cert. at 15–16 (citing, *inter alia*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972); *Treehouse*, 2020 WL 919249, at *9). Defendants do not dispute this, nor do they address—much less distinguish—the authority cited by Plaintiffs in support of the out-of-pocket damages model. *See* Resp. Recall that Dr Tabak's methodology calculates damages using an event study to measure the amount of artificial inflation in Boeing stock, which was traded in an efficient market on each day of the Class Period. According to Dr. Tabak, the event study "account[s] for changes in market and/or industry effects, on the dates of (or the trading dates

[8]"An event study is a statistical method that examines whether a specific event had an impact on a public company's stock price." *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *15 (S.D. Cal. Mar. 20, 2023).

following) the (remaining) corrective disclosures alleged in this case." Tabak Rpt. ¶ 85.

The Court finds that Dr. Tabak's proposed methodology is capable of measuring class-wide damages and is consistent with Plaintiffs' theory of liability. Dr. Tabak proposes using an event study and "out-of-pocket" methodology to measure damages. That is all Rule 23(b)(3) and *Comcast* requires. The use of the out-of-pocket damages model is the standard measurement of damages in Section 10(b) securities cases. *TreeHouse*, 2020 WL 919249, at *9. The Court finds that Plaintiffs' proposed damages methodology is sufficient under *Comcast* because the methodology can isolate different categories of misrepresentations and measure the damages stemming from each. Indeed, as Plaintiffs correctly state in Reply, other courts have rejected similar arguments to those Defendants make here about the insufficiency of damages models under *Comcast*. Reply at 4–5 n.3; *TreeHouse*, 2020 WL 919249, at *9 (rejecting defendants' argument that plaintiffs' expert's damages model was insufficient where he "proposed the same nonspecific theory at least five times in the past four years," but no other court rejected that nonspecific theory) (cleaned up); *RH*, 2018 WL 4931543, at *3 (rejecting defendants' argument that plaintiffs' "failure to describe a specific method is fatal to certification because there is no way for the Court to determine whether the proposed methodologies will measure damages that are solely attributable to plaintiffs' theory of liability"). Like in *TreeHouse*, here, Plaintiffs have cited numerous cases in which courts have found Dr. Tabak's event study out-of-damages methodology to be sufficient under *Comcast* and to support class

certification. Reply at 5–6 n.4 (citing *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *15–16 & n.20 (S.D. Cal. Mar. 20, 2023) (Dr. Tabak's event study with the out-of-pocket damages methodology is "consistently held" to be "an appropriate method for measuring stock price inflation caused by alleged misrepresentations"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *8 (N.D. Cal. May 9, 2022) (plaintiff "adequately disclosed a class-wide damages model under *Comcast*" where Dr. Tabak set forth the out-of-pocket damages model).[9]

The cases cited by Defendants in support of their position that Dr. Tabak's failure to offer any methodology or model for measuring inflation is fatal, are distinguishable, as correctly argued by Plaintiffs, as they were consumer protection or antitrust, not securities cases, for which the out-of-pocket model advanced by Dr. Tabak here is inapplicable. *See Ward*, 784 F. App'x 539; *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239; *Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840.[10]

---

[9]*See also Teva*, 2021 WL 872156, at *40 (joining "[n]umerous courts" in holding that Dr. Tabak's "proposed use of [the same] three-step analysis" he articulates here satisfies *Comcast*); *La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2017 WL 3149424, at *7 (D. Vt. July 21, 2017) (Dr. Tabak's methodology "can be applied on a class-wide basis" and "does not run afoul of *Comcast*."); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 516–17 (D. Minn. 2015) ("For purposes of finding the predominance requirement satisfied in a securities fraud case, courts commonly accept methodologies similar to Dr. Tabak's proposal for determining individual damages.").

[10]The court in *Treehouse* also found *Ohio Pub. Emps.' Ret. Sys.* to be distinguishable because, in that case, the court struck portions of the expert's report, finding parts of it to be "entirely improper"; moreover, the court also held that the plaintiffs' liability theory did not hold together. *Treehouse,* 2020 WL 919249, at *9 n.8 (citing *Ohio Pub. Emps.' Ret. Sys.,* 2018 WL 3861840, at *7, *17–20). The *Treehouse* court noted, therefore, that there was "little wonder that the court went on to hold that there was no congruence between the inadequate liability theory and sketchy theory of damages." *Id.*

All in all, the Court agrees with Plaintiffs that Dr. Tabak's event study including the out-of-pocket damages methodology is an adequate method for measuring stock price inflation caused by Defendants' alleged misrepresentations. At this stage, Plaintiffs' task is to present a viable, internally consistent, and truly classwide approach to damages, and they have done so.

Defendants' argument that Dr. Tabak's damages model "fails to account for the evolving information about Boeing disclosed during the [C]lass [P]eriod that would have affected the market's perception of the value-relevance of the alleged misstatements and thus any inflation in Boeing's stock price" also falls flat. Resp. at 20. Defendants rely on their own expert, Dr. Mark Garmaise's, report, which explains why the evolving nature of the publicly disclosed facts about Boeing during the Class Period presents difficult challenges in measuring inflation. *Id.* Defendants also cite numerous examples of public information released throughout the Class Period related to Boeing's changing relationship with the FAA and the widespread reporting of technical issues with MCAS and the 737 MAX's AOA sensors, which, according to Boeing must be accounted for in a damages model and its effect on inflation during the Class Period. *Id.* at 20–21.

But, as Plaintiffs point out in Reply, Defendants cite no authority in support of this argument. Reply at 15. Moreover, this is the kind of argument addressed—and rejected—by the authority cited by Plaintiffs in their opening motion. *See, e.g.*, *TreeHouse*, 2020 WL 919249, at *10 (rejecting defendants' argument that plaintiffs' expert's damages model was inadequate, as "[a]ll kinds of factors affect a stock's price

on any given day—the effect of any misrepresentation therefore fluctuates over time as investors incorporate that information with the myriad other inputs that go into buy-sell-hold decisions," but "the limitations [d]efendants identify are not unique to this case and need not be resolved before the class is certified."); *see also Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at *4 (N.D. Ill. Mar. 29, 2018) ("Here, the defendants argue that there is not sufficient detail about how damages will be calculated in light of potentially confounding information disclosed during the class period. The impact of the additional information disclosed during the class period, however, is common to the class, and therefore does not call into question whether damages can be calculated on a class wide basis."). Indeed, at least one court has rejected Dr. Garmaise's similar challenges to certification. Reply at 15 (citing *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *8 (N.D. Cal. May 19, 2023) (rejecting Dr. Garmaise's challenges, noting that the out-of-pocket methodology is "flexible enough to accommodate" "complicating factors" such as "investor uncertainty about risk, investors' beliefs about [a] merger," and the "impact of alleged corrective disclosures," concluding that "the fact that calculating damages is a complex undertaking does not undermine the use of the out-of-pocket model, nor does it militate against certifying the class"). The Court agrees with Plaintiffs that the existence of evolving public information does not prevent certification of a Class.

Finally, the Court turns to Defendants' argument that Dr. Tabak fails to explain how his damages methodology is consistent with Plaintiffs' theory of liability

in the case, specifically, Plaintiffs' (1) reliance on the repetition of certain alleged misstatements, and (2) contention that certain statements were "corrected" by the materialization of the supposedly understated risk. Resp. at 15–16.

As to the former, the way Defendants see it, "any methodology that attempts to measure inflation in Boeing's stock price throughout the [C]lass [P]eriod must account for Plaintiffs' theory that the repetition of certain statements contributed to their materiality and impact on the market." Resp. at 16. Which would mean, according to Defendants, that the inflation supposedly created by the statements must have increased as they were repeated. *Id*. (citing *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013)) (*BP I*).

The Court finds Defendants' argument regarding repetition of the alleged misstatements to be substantially similar to the ones it has rejected above.[11] As Plaintiffs argue, the potentially inflationary effect of repeated statements can be accounted for in the out-of-pocket damages model and would affect all Class members equally so as to not undermine predominance. Reply at 8 (citing, *inter alia*, *Waggoner*, 875 F.3d at 106 ("[W]e are not persuaded by the Defendants' argument that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time. *Comcast* does not suggest that

[11]The Court finds that it can resolve this argument without addressing Plaintiffs' new Reply arguments citing to Dr. Tabak's Reply Report, and therefore again does not consider Defendants' Sur-Response. More specifically, the Court does not consider Plaintiffs' argument, or Dr. Tabak's Reply Report stating, that the inflation from Defendants' statements "must have increased as they were repeated." Reply at 7–8 (citing R. 434-3, Tabak Reply Rpt. ¶ 37). The cases cited by Plaintiffs in Reply on which the Court relies on here are simply responsive to arguments raised by Defendants' Response.

damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.'") (quoting *Comcast*, 569 U.S. at 35); *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 640 (S.D. Ohio 2025) ("Plaintiffs' expert notes that the evidence may show varied rates of artificial inflation and that, if so, the variance can be incorporate[d] into the [out-of-pocket] damages model.").

The only case Defendants cite, *BP I*, does not change the result. In that case the court found a fatal "disconnect[] between damages and liability" given plaintiffs' theory that "the repetition of certain statements" had a "cumulative inflationary effect," and therefore the plaintiffs' damages model did not satisfy the second prong of *Comcast*. 2013 WL 6388408, at *17. The Court respectfully disagrees that variations in inflation—including that caused by repetition of allegedly false and misleading statements—that can be, but are not currently, accounted for in an out-of-pocket damages model cannot satisfy *Comcast*. Critically, the *BP I* court relied on three non-securities cases in support of its conclusion that there was a disconnect between damages and liability. 2013 WL 6388408, at *17 (citing *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at *15–18 (N.D. Tex. July 9, 2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253–55 (D.C. Cir. 2013); *In re Montano*, 493 B.R. 852, 860 (Bankr. D. N.M. 2013)). But, as discussed in depth above, myriad courts since *BP I* have found that event studies with the out-of-pocket damages methodology, like the one employed by Dr. Tabak, are sufficient to satisfy *Comcast*.

The Court acknowledges that, as Defendants point out in their sur-response, R. 452-1, Sur-Resp. at 1, most of the cases relied on by Plaintiffs—and this Court—that have rejected arguments under *Comcast* are district court cases (the exception being *Waggoner*, 875 F.3d at 106, a Second Circuit case). But in their underlying briefing, Defendants cite just *BP I* (and *BP II*, discussed below—both district court cases) in support of their arguments that models like Dr. Tabak's are insufficient to satisfy *Comcast*. The Court agrees with Plaintiffs that the Sixth Circuit case cited in Defendants' notice of supplemental notice of authority, R. 463, does not move the needle, as in that case, the Sixth Circuit reversed and remanded the district court's grant of class certification on the plaintiffs' Securities Act and Exchange Act claims where the "district court rejected [the defendant's] objections to [the p]laintiffs' experts ***in one sentence*** and concluded without any additional analysis that predominance exists with respect to damages for the same reasons as articulated in the previous section" concerning statutory Securities Act damages, for which there is a statutory damages formula. *In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 621 (6th Cir. 2025) (cleaned up) (emphasis added). At bottom, *In Re FirstEnergy Corp. Sec. Litig.* stands for the proposition that that a district court must conduct the required analysis under *Comcast* for each theory of liability at issue. True, the Fourth Circuit has granted Boeing's petition to decide "[w]hether securities plaintiffs can satisfy their evidentiary burden under *Comcast* by having their expert recite the generally applicable rule for measuring damages for such claims and promise to develop a methodology for applying that rule to the particular facts of the case at a

later date." *In re the Boeing Co. Sec. Litig.*, No. 25-135 Dkt. Nos. 2, 36 (4th Cir. Mar. 21, 2025) (granted May 2, 2025). But the Fourth Circuit has not yet ruled on the question, and, even when it does, such a ruling would be persuasive only. Accordingly, for now, the Court follows the vast majority of district courts answering the above question in the affirmative. And, on the other side of the coin, the Ninth Circuit recently denied a Rule 23(f) appeal challenging plaintiffs' out-of-pocket methodology where the district court had properly analyzed the plaintiffs' Exchange Act theory of liability. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *8 (N.D. Cal. Apr. 25, 2025), *leave to appeal denied*, 2025 WL 2028400 (9th Cir. July 17, 2025) ("Courts have found that federal securities class actions often fit Rule 23 like a glove, and the out-of-pocket or event study method is the standard method for calculating damages in virtually every Section 10(b) class action.") (cleaned up).

The Court now turns to Defendants' argument that Dr. Tabak's damages model does not account for Plaintiffs' purported "materialization of the risk" theory of liability prior to the Ethiopian Airlines Crash.[12] Resp. at 17. Defendants point out that Dr. Tabak acknowledged in his deposition that he was not even aware that Plaintiffs rely on a materialization of the risk theory, although Plaintiffs expressly invoked such a theory in their opposition to Defendants' second motion to dismiss: that is, Plaintiffs argued that the Ethiopian Airlines Crash "was a materialization of the safety risks" supposedly concealed by the November 2018 statements after the Lion Air accident. *Id.* (citing Tabak Tr. at 118:12–121:4; R. 305 at 40–41). Defendants'

---

[12]Plaintiffs' Reply to this argument relies heavily on Dr. Tabak's Reply Report, and thus the Court considers Defendants' Sur-Response.

expert, Dr. Garmaise, opined that, under this theory of liability, at least some of the stock-price decline on the date when the risk materialized reflects the occurrence of the event itself (*i.e.*, the Ethiopian Airlines Crash) rather than the correction of prior alleged misstatements. *Id.* (citing R. 420-1, Garmaise Rpt. ¶ 71). Indeed, Dr. Tabak acknowledged during his deposition that Boeing's stock price would have declined following the Ethiopian Airlines Crash regardless of whether Defendants made any allegedly misleading statements following the Lion Air Crash. *Id.* (citing Tabak Tr. at 130:12–15). Yet, from Defendants' point of view, Dr. Tabak fails to explain how to separate the price effect of the Ethiopian Airlines Crash from the price effect of the alleged "correction" of Defendants' prior misstatements. *Id.*

Defendants rely heavily on *In re BP p.l.c. Securities Litigation*, 2014 WL 2112823 (S.D. Tex. May 20, 2014) (*BP II*). In *BP*, the Deepwater Horizon, an off-shore drilling rig leased by BP, exploded, resulting in the death of several workers and a catastrophic oil spill. The plaintiffs, like Plaintiffs here, alleged that the defendants' statements about safety "lulled the market into believing that BP was a safer company than it actually was" until the "fraud was revealed when the Deepwater Horizon exploded." *Id.* at *2. The plaintiffs in *BP II* moved to certify two subclasses: a pre-explosion class and a post-explosion class. *Id.* The pre-explosion subclass sought to recover for BP's false assurances that misled investors about BP's process safety and the ability to prevent events like the Deepwater Horizon explosion. *Id.* at *2–4. The post-explosion subclass sought to recover based on BP's false statements regarding the amounts of oil being released in the spill. *Id.* at *4–5.

In opposing certification of the pre-explosion subclass, BP argued that "[b]ecause the pre-explosion damages methodology is not based on the 'but for' price that the stock would have traded at absent [BP's] alleged fraud, it represents an impermissible windfall for investors, protecting them from the downside consequences of an assumed (if allegedly understated) risk." *BP II*, 2014 WL 2112823 at *10. Importantly, in *BP II*, the pre-explosion subclass did not seek out-of-pocket damages based on the artificial inflation of the stock price; instead, they claimed to be entitled to the full value of the drop in stock price following the Deepwater Horizon explosion as *consequential damages*. *Id.* The district court refused to certify the subclass, explaining that, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." *Id.* Therefore, the causation damages sought by the pre-explosion sub-class were "antithetical to the 'fraud-on-the-market' theory" of liability by which investors sought class-wide resolution of their claims. *Id.* at *12. Put another way, the proposed damages model was inconsistent with the class's theory of liability in violation of *Comcast*. The court acknowledged that the plaintiffs may have been able to perform an "out-of-pocket" measurement of damages on a classwide basis, but refused to certify a class on that basis, as the plaintiffs did not give the court "any information about how the alternative calculation would be performed." *Id.* The Fifth Circuit affirmed the denial of class certification, stressing that the question was "not whether the

'materialization of the risk' theory" is ever viable, but rather "whether a damages model based on this theory is 'susceptible of measurement across the entire class . . .' as required by *Comcast*." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 689–90 (5th Cir. 2015) (cleaned up).

On the other hand, the district court in *BP II* certified the post-explosion subclass, as it "propose[d] to model damages . . . by calculating the inflation caused by the fraudulent statements." *BP II*, 2014 WL 2112823 at *4. The Fifth Circuit affirmed, noting that the liability theory for the post-explosion subclass was consistent with its damage theory: "the liability stems from . . . misstatements, and the loss forming the basis for Plaintiffs' damages model comes from the inflated stock price caused by those misstatements." *Ludlow v. B.P., P.L.C.*, 800 F.3d at 687.

As in initial matter, Plaintiffs retort that Defendants' entire argument is misplaced, as the Seventh Circuit has held that materialization of the risk is simply a way to describe loss causation; it is not a separate theory of liability. Reply at 9–10 (citing *Schleicher*, 618 F.3d at 683–84 ("The phrase [materialization of the risk] adds nothing to the analysis . . . . [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.")). Numerous other courts have rejected similar arguments that loss causation theories labeled "materialization of the risk" fail to satisfy *Comcast*. *Id.* at 10–11 & n.6 (citing, *inter alia*, *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 369 (N.D. Cal. 2024) ("As a threshold matter, materialization of the risk, at least as it is asserted here, is a theory of loss causation, not liability, meaning it is the plaintiffs'

burden to prove at the merits stage, not at class certification."); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *18 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (collecting cases); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019)).

Plaintiffs stress that, unlike the pre-explosion sub-class in *BP II*, Plaintiffs here do not seek consequential damages; instead, they seek damages to be calculated by an "out-of-pocket" model calculating the amount of inflation the alleged fraudulent statements caused, that were later "corrected" by the Ethiopian Airlines Crash. Reply at 11. Plaintiffs propose two models for calculating the loss.

First, Plaintiffs point out that Dr. Tabak testified, and later memorialized in his Reply Report, that in his expected "but for" analysis where Defendants disclosed the full truth, the 737 MAX would have been grounded at the outset of the Class Period, meaning there would have been no safety-related artificial inflation injected into the stock. Reply at 12–13 (citing Tabak Tr. at 129:18–22; R. 434-3, Tabak Reply Rpt. ¶ 22). Dr. Tabak therefore stated that, "for [his] damages analysis, [he] will not have to estimate the likelihood of a future second crash (after the Lion Air crash before the start of the Class Period) or concern [himself] with issues related to any materialization of risk," apart from certain costs associated with the Ethiopian Airlines Crash itself, such as "payments to the estates of the passengers and crew who perished" in the Ethiopian Airlines crash, which may need to be removed from the market reaction to the Ethiopian Airlines Crash. Tabak Reply Rpt. ¶¶ 22, 57.

Second, Plaintiffs posit that, if the Court requires them to supply a distinct methodology for a "materialization of the risk" theory of loss causation, Dr. Tabak's Reply Report explains how, if necessary, he could construct a damages model that would assist the jury in calculating inflation rates over the Class Period based on a "materialization of the risk" theory, guided by discovery in this action. Reply at 14. Specifically, Dr. Tabak explains that this model would compare (i) "the market's actual perception of the risk (here of an MCAS-related 737 MAX plane crash)" and (ii) "what the perception of that risk would be had the alleged misrepresentations and omissions been corrected." *Id.* (quoting Tabak Reply Rpt. ¶ 58). To do so, Dr. Tabak explains that, for example, one could review the analyst reports during the time period between the Lion Air Crash and the Ethiopian Airlines Crash "to see what discount, if any, analysts applied to their valuation of Boeing to account for" the risk of another event "to estimate the market's actual perception of the risk." *Id.* (quoting Tabak Reply Rpt. ¶ 59).

Predictably, Defendants take issue with both of Plaintiffs' proposed models. As to the first one, in which Dr. Tabak presumes that the 737 MAX would have been grounded, Defendants contend that Plaintiffs are now abandoning "a central element of their liability theory on which they relied to avoid dismissal of an alleged corrective disclosure." R. 452-1, Sur-Resp. at 7. That is, Plaintiffs previously argued that the Amended Complaint adequately alleges that the Ethiopian Airlines Crash is a corrective disclosure because that accident constituted a "materialization of the safety risks" concealed by Defendants' alleged misstatements. *Id.* (citing R. 305 at

40–41; Am. Compl. ¶ 525). Dr. Tabak's new theory appears for the first time in Plaintiffs' Reply, which is inappropriate, submit Defendants. *Id.* at 8. Moreover, argue Defendants, Dr. Tabak's opinion about "the more reasonable view" of what would have happened if Boeing had made a different disclosure is speculative and outside Dr. Tabak's area of expertise. *Id.* (citing Tabak Reply Rpt. ¶ 57; R. 452-4, Garmaise Sur-Resp. Rpt. ¶ 38; *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017); *Warrick* v. *United States*, 2024 WL 4894273, at *11 (N.D. Ill. Nov. 26, 2024)).

As to Defendants' first point, the Court notes that Dr. Tabak testified during his April 7, 2025 deposition that the relevant "risk" that was concealed by Defendants' alleged false and misleading statements in this case was "not a probability of a crash. It's what the effects of either a crash or the safety information would have done on Boeing's ability to sell and deliver planes." Tabak Tr. at 129:18–22. So, the Court disagrees with Defendants that this theory appeared for the very first time in Plaintiffs' Reply, filed on June 6, 2025; however, Defendants are correct that it was not clear from the face of the Amended Complaint that Plaintiffs were pursuing such a damages theory. Sur-Resp. at 7. Along those lines, Defendants correctly point out that the Court allowed Plaintiffs to proceed with their claim that the Ethiopian Airlines Crash functioned as a corrective disclosure based on Plaintiffs' allegation that the crash was a "materialization of the safety risks Defendant concealed." *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1022 (N.D. Ill. 2024) (quoting R. 306 at 49, 42).

The Court agrees with Defendants that this damages model is untethered to the theory of liability alleged in the FAC.

Moreover, the Court agrees that Defendants are correct to question Dr. Tabak's expertise to opine whether it was more reasonable, that without Defendants' alleged misstatements, the 737 MAX would have been grounded or been allowed to continue flying and result in a crash. Sur-Resp. at 8. It is well-settled in the Seventh Circuit that, "when an expert's report or testimony is critical to class certification, . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010). Here, Dr. Tabak's report fails to provide a basis for his challenged opinion, and Plaintiffs, as the proponent of the expert, bear the burden of establishing the admissibility of the opinion. Which Plaintiffs failed to do. Therefore, the Court finds that Dr. Tabak may not opine on "the more reasonable view" of what would have happened if Boeing had made different disclosures; thus, for this reason in addition to the one discussed above, the Court will not consider the damages model based on the assumption that the 737 MAX would have been grounded in Defendants had made proper disclosures.

Turning to Plaintiffs' second model, which accounts for the materialization of the risk, Defendants argue that Dr. Tabak has not sufficiently supplied a methodology for calculating the market's actual perception of the risk of a crash or what the perception of that risk would have been if the alleged misrepresentations and omissions had been corrected. Sur-Resp. at 11. For the same reasons that the

Court found Dr. Tabak's proposed model to be sufficient to account for inflation, the Court finds it to be sufficient here, as well. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (defendant's expert's "contention that [p]laintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument goes beyond the Rule 23 inquiry.") (cleaned up)); *see also Schleicher*, 618 F.3d at 685 ("It is possible to certify a class under Rule 23(b)(3) even though all statements turn out to have only trivial effects on stock prices. Certification is appropriate, but the class will lose on the merits.").

In sum, the Court finds that Plaintiffs have established a common methodology for measurement of damages that is applicable classwide.

**2. Class Period**

In securities fraud class action cases, "courts are required to cut off the class period on the date of a statement or event that cures the market." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 310 F.R.D. 69, 97 (S.D. N.Y. 2015) (cleaned up). "In other words, a class period ends when the truth has been disseminated to the market." *Id.*

Recall, Plaintiffs seek to certify a class for the period between November 7, 2018 and December 16, 2019, ending when Boeing announced that it was suspending production on the 737 MAX. According to Plaintiffs, that announcement "expose[d]

the true depth of the issues surrounding the plane and the unrealistic nature of the return to service timelines Defendants had previously provided." Memo. Class Cert. at 7–8 (citing Am. Compl. ¶¶ 348–49). Boeing shares dropped $14.67 per share the next day, a 4.3% decline. *Id.* at 8.

Defendants, on the other hand, ask the Court to end the Class Period on October 18, 2019, because the "truth" that the 737 MAX was not returning to service in 2019 was "disseminated to the market" *before* December 16, 2019.[13] Resp. at 22. From Defendants' perspective, the evidence uniformly shows that the market learned more than a month earlier, on November 11, 2019, that the return-to-service timeline had been extended into 2020, and that was confirmed again on December 11 and 12, 2019. *Id.* Defendants maintain that there was no statistically significant decline in Boeing's stock price on any of those dates. *Id.* Therefore, argue Defendants, December 16, 2019 cannot serve as the end date of the Class Period. *Id.* (citing *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011), *abrogated on other grounds by Sodha v. Golubowski*, 154 F.4th 1019 (9th Cir. 2025) ("the decline in stock price caused by the revelation of that truth must be statistically significant")).

Plaintiffs counter that Defendants' argument is, at bottom, a truth-on-the-market defense inappropriate for resolution at the class certification stage. Reply at 17–18 (citing *Amgen*, 568 U.S. at 481–82 (holding evidence that "news of the truth credibly entered the market and dissipated the effects of prior misstatements" is "a

[13]The Court finds that Plaintiffs' Reply does not contain new arguments or evidence that should have been included in their opening memorandum, and thus the Court does not consider Defendants' Sur-Response.

matter for trial") (cleaned up); *Basic*, 485 U.S. at 249 & n.29 (when news "credibly entered the market and dissipated the effects of the misstatements" is "a matter for trial").

The Seventh Circuit's decision in *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 611 (7th Cir. 2020), undercuts Plaintiffs' position. In *Allstate*, the court began by noting that in *Basic v. Levinson*, the seminal case on the fraud-on-the-market theory, the United States Supreme Court established "the fraud-on-the-market presumption [that] allows plaintiffs to avoid proving individual reliance upon fraudulent misrepresentations and omissions. Instead, plaintiffs may prove that the given securities traded in efficient markets in which prices reflect all publicly available information, including misrepresentations, and all investors were thus entitled to rely on that public information and pricing." 966 F.3d at 600 (citing *Basic*, 485 U.S. at 246–47). The court observed that "[e]vidence supporting or refuting the *Basic* presumption of reliance is often relevant to three other closely related issues in a securities fraud case—materiality, loss causation, and transaction causation." *Id.* The court explained in *Allstate* that "[r]ecent Supreme Court decisions on those issues pose a difficult challenge at the class certification stage." *Id*. A district court deciding whether to certify a class, however, may not use the evidence to decide loss causation, nor may it use the same evidence to decide materiality. *Id*. (citing *Amgen*, 568 U.S. 455; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (*Halliburton I*); *Halliburton II*, 573 U.S. 258). "Those questions are left for the merits." *Id*. Yet "a court *must* consider the same evidence if the defense offers it to show the absence of

transaction causation, also known as price impact." *Id.* (citing *Halliburton II*, 573 U.S. 258) (emphasis in original).

The court explained, in relevant part:

> A district court deciding whether the *Basic* presumption applies must consciously avoid deciding materiality and loss causation. *Halliburton I* and *Amgen* require that much. At the same time, a district court must be willing to consider evidence offered by the defense to show that the alleged misrepresentations did not actually affect the price of the securities. *Halliburton II* requires that. And yes, the same evidence is likely to have obvious implications for the off-limits merits issues of materiality and loss causation. *Halliburton II* teaches, however, that a district court may not use the overlap to refuse to consider the evidence. The court must still consider the evidence as relevant to price impact (also known as transaction causation).

*In re Allstate Corp. Sec. Litig.*, 966 F.3d at 608.

Loss causation is "*the act or omission of the defendant* alleged to violate this chapter [that] *caused the loss* for which the plaintiff seeks to recover damages." *In re Allstate Corp. Sec. Litig.*, 966 F.3d at 605 (quoting 15 U.S.C. § 78u−4(b)(4)) (emphasis in original). Price impact, as defined in *Halliburton I*, is "the effect of a misrepresentation on a stock price." *Id.* at 607 (quoting *Halliburton I*, 563 U.S. at 814). While Plaintiffs seeking certification need not offer evidence of price impact, Defendants may make "*[a]ny showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," and such a showing "will be sufficient to rebut the presumption of reliance." *Id.* at 608–09 (citing *Halliburton II*, 573 U.S. at 279; *Basic*, 485 U.S. at 248) (emphasis in original). "This showing may include direct evidence demonstrating that the alleged misrepresentations had no impact on the stock price." *Id.* at 609 (citing *Halliburton II*, 573 U.S. at 279–80). At this stage,

Defendants bear the burden of production and persuasion by a preponderance of the evidence that they have "sever[ed] the link" of transaction causation. *Id.* at 610–611 (cleaned up).

Accordingly, the Court examines the evidence adduced by Defendants to determine whether they have met their burden.[14] Defendants point to Boeing's November 11, 2019 737 MAX Progress Report that disclosed that Boeing was "working towards final validation of the updated training requirements, which must occur before the MAX returns to commercial service, and which [is] now expect[ed] to begin in January." Resp. at 23 (quoting R. 418-6, Nov. 11, 2019 Report). Defendants note that this report caused securities analysts to report that same day that "Boeing now expects the aircraft to return to service (RTS) in January 2020," *id.* (quoting R. 418-8), and was "pointing toward a return to commercial service (RTS) in January," *id.* (quoting Ex. 418-9). Significantly, argue Defendants, Boeing's stock price *increased* on that date. *Id.* (citing Garmaise Rpt. Exh. 3 at 15). Defendants also cite a December 11, 2019, *Seattle Times* article quoting FAA Administrator Stephen Dickson as saying, "[i]f you do the math, [FAA approval is] going to extend into 2020." *Id.* (quoting R. 418-10). This report caused securities analysts to advise investors that "the 737 MAX recertification would stretch into 2020," contrary to Boeing's prior

[14]Plaintiffs argue that Defendants do not make a "price impact" argument, so the Court should not engage in any analysis at this stage. Reply at 20. The Court agrees that Defendants do not use the phrase "price impact," and indeed, do not affirmatively raise that argument. *See* Resp. The substance of their argument, however, falls within *Allstate*'s description of a price impact argument that it found it to be error for a district court to ignore at class certification: that is, Defendants argue that the truth about the 737 MAX's return to service had been corrected on the market before the December 16, 2019 corrective disclosure alleged by Plaintiffs, and "the market shrugged off the purported news." Resp. at 24.

estimate of December 2019. *Id.* (citing R. 418-11). One day later, on December 12, 2019, the *Seattle Times* reported that Boeing had announced after a meeting with Dickson that day that "[w]e will work with the FAA to support their requirements and their timeline as we work to safely return the Max to service *in 2020*." *Id.* (citing R. 418-13 (emphasis in Response)). That same day, the *Wall Street Journal* issued an article stating that the FAA "is expected to approve fixes to a MAX flight-control system and related pilot training no sooner than February." *Id.* at 24 (quoting R. 418-14). On December 13, 2019, securities analysts reported that "Dickson said ungrounding would not be before January—already unlikely given no milestone announcements in the last two weeks. According to reports, *the FAA expects to approve the technical fixes and related pilot training in February, with a risk that this may slip into March*." *Id.* (quoting R. 418-15 (emphasis in Response)). Defendants stress that Dr. Tabak's event study shows no statistically significant decline in Boeing's stock price on either December 11 or 12, 2019. *Id.* (citing Garmaise Rpt. Exh. 3 at 16).

Defendants aver that, by December 11 and 12, 2019 at the latest, "the truth ha[d] been disseminated to the market" that the 737 MAX was not returning to service in 2019, thereby correcting Defendants' prior estimates challenged in this case, and "the market shrugged off the purported news." Resp. at 24 (citing *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *7 (S.D. Tex. Feb. 9, 2024)). Additionally, posit Defendants, Dr. Tabak's report does not explain how he intends to show that the statistically significant stock price decline that occurred on December

16, 2019—when the market became aware of a production halt that was itself economically significant for Boeing (*see* Garmaise Rpt. ¶ 103)—can be linked to an alleged misimpression in the market that the 737 MAX would return to service in 2019. *Id.*

Plaintiffs retort that "Defendants have not come close to offering adequate evidence to establish that the fraud was 'conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.'" Reply at 20 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (cleaned up)). According to Plaintiffs, Defendants distort the "truth" that Plaintiffs allege was concealed: that is, Defendants style the "truth" that was concealed as being that the 737 MAX was not returning to service in 2019, whereas Plaintiffs' theory in fact, sustained by the previously assigned judge, is that "Muilenburg projected confidence that the MAX would quickly return to service . . . while knowing, but not disclosing, that the FAA saw the matter very differently." Reply at 20–21 (citing *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *23 (N.D. Ill. Aug. 23, 2022)). Undermining this theory, however, is one of the reports, issued on December 13, 2019, cited by Boeing, which states that "[p]ress reports late Thursday (Bloomberg, WSJ) indicated FAA Administrator Dickson met with Boeing CEO Muilenburg to discuss ungrounding the 737 MAX. *Reports indicate Dickson was concerned Boeing has discussed an unrealistic recertification timeline*." Resp. at 24 (quoting R. 418-15) (emphasis in Resp.).

Plaintiffs also point to Boeing's public statements on December 12, 2019, that Boeing "had a productive meeting" with the FAA and was "committed to addressing all of the FAA's questions." Reply at 23 (quoting R. 305-5). Courts evaluating loss causation, point out Plaintiffs, have declined to find the truth was previously disseminated to the market where the prior reports were "counteracted by [a company's] contemporaneous statements." *Id.* (quoting *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006); citing *In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 185 (E.D. Pa. 2001) (defendants' "aggressive public comments . . . aimed at countering the [curative] effect of" a report ensured it "was not curative information or a curative disclosure," since "it would not have been unreasonable for an investor to rely on defendants' alleged misrepresentations after its publication"); *see also In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (prior report did not reveal the truth where defendants "misleadingly reassured investors"). The Court is not persuaded that Boeing's statements counteracted the December 11 and 12 articles' dissemination of the truth that Boeing and the FAA were not aligned on the 737 MAX's return-to-service date or that the 737 MAX would not return to service in 2019. The *Seattle Times* article cited by Defendants and released the same day as Boeing's public statement characterized Boeing's statement as "bland." R. 418-3 ("Though the wording of the [FAA] email amounts to a public rap on the knuckles for Muilenburg, Boeing issued a bland statement afterward saying that Muilenburg and Deal had 'a productive meeting' with Dickson and his deputy Dan Elwell."). And the cases cited by Plaintiffs are inapposite: both *Lapin* and *Snap*

were decided at the motion to dismiss stage, thus taking all well-pled allegations as true; and *Res. Am. Sec. Litig.* involved just one allegedly corrective report that was counteracted by "aggressive public comments" from the defendant, such that the court found that "it would not have been unreasonable for an investor to rely on defendants' alleged misrepresentations after its publication." 202 F.R.D. at 185. Here, on the other hand, Defendants point to several articles disclosing that the 737 MAX would not be returning to service in 2019 and at least two discuss the disconnect between Boeing and the FAA, countered only by a "bland" public statement from Boeing.

Finally, Plaintiffs cite to the significant market reaction to the December 16, 2019 disclosure, arguing that it demonstrates that it was curative, and that the truth was not previously on the market. Reply at 23. Defendants do not explain, through their expert or otherwise, argue Plaintiffs, what else could have caused the price drop. *Id.* But as stated above, the Court agrees with Defendants that the December 11 and 12, 2019 publications had already made the market aware of the 737 MAX's 2020 return-to-service and Boeing's disconnect with the FAA, with no price drop on those dates, so the fall in Boeing's stock on December 16, on its own, does not demonstrate that the price decline was in response to *new* corrective information (rather than, as Defendants posit, the fact of the production halt in itself).

In sum, based on the evidence before it, the Court finds that Defendants have proven by a preponderance that Defendants' alleged misrepresentations had no

impact on the stock price. Thus, the Court agrees that the end date of the Class Period must be October 18, 2019.

**3. Options Traders**

Recall that Plaintiffs seek to certify a Class that includes not only all persons or entities who purchased or otherwise acquired Boeing *common stock*, but also those who purchased or acquired *call options* or sold *put options*. Memo. Class Cert. at 1. Defendants contend that Plaintiffs fail to satisfy their evidentiary burden on options for two separate reasons: (1) Plaintiffs fail to prove that Boeing options traded in an efficient market, and (2) Plaintiffs fail to present a methodology capable of measuring damages for options on a classwide basis consistent with their theory of liability. Resp. at 26.

**a. Efficiency**

Starting with an efficient market, Plaintiffs posit that, "[b]ecause there is a 'close connection between options and the stock on which they are based, if the stock trades in an efficient market, it is highly likely that the options on that stock will as well.'" Memo. Class Cert. at 23 (quoting Tabak Rpt. ¶ 79); citing Tabak Rpt. ¶ 68 ("[I]f the market for Boeing's common stock is efficient, there is a mechanism to make the markets for its options efficient as well . . . option markets may be as efficient if not more efficient than markets for stock in the same company.")). Numerous courts, according to Plaintiffs, have similarly found that evidence that a company's common stock traded in an efficient market to also be evidence that the company's options also traded efficiently. Reply at 24 (citing, *inter alia*, *see In re Countrywide Fin. Corp. Sec.*

*Litig.*, 273 F.R.D. 586, 609 n.74 (C.D. Cal. 2009) (the efficiency of common stock and options for heavily traded companies is "very nearly a nonissue") (cleaned up)); *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988) (the "market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that price"); *Rougier*, 2019 WL 6111303, at *14 (market efficiency for common stock is sufficient to prove options market efficiency)).

Defendants argue that Plaintiffs fail to prove that Boeing options trade in an efficient market for three reasons. First, Dr. Tabak's analysis oversimplifies the thousands of different options captured by Plaintiffs' proposed class. Resp. at 25. From Defendants' point of view, each listed option is a "distinct financial instrument consisting of a unique combination of option type (call or put), strike price, and maturity date." *Id.* at 26–27 (citing Garmaise Rpt. ¶¶ 122, 125). As a result, argue Defendants, different options series trade in different markets and are not fungible with one another, unlike common stock. *Id.* at 27. Defendants point out that Dr. Tabak admitted that each option is a distinct security trading in a different market, and that the markets for some options can be inefficient even though the markets for other options for the same issuer are efficient. *Id.* (citing Tabak Tr. 65:9–23, 103:9–13). Yet Dr. Tabak treated all options the same. Second, Dr. Tabak failed to apply the *Cammer* factors or the *Krogman* factors to each listed Boeing option, many of which, posit Defendants, do not support a finding of market efficiency. *Id.* (citing Garmaise Rpt. ¶¶ 133–135, 139). For example, argue Defendants, Dr. Tabak provides no analysis of the trade volume of different Boeing options during the Class Period. *Id.*

(citing Tabak Rpt. ¶ 69). Relying on Dr. Garmaise's report, Defendants argue that many Boeing options had very low, or even *no*, trade volume during the Class Period. *Id*. at 27–28 (citing Garmaise Rpt. ¶¶ 145–146). Additionally, although Dr. Tabak states that a stock price's reaction to new news is important evidence of market efficiency, he ignores, argue Defendants, that on March 18, 2019, one of the alleged corrective disclosure dates, the price of a substantial portion of Boeing put options actually *decreased* (the opposite of what would be expected for put options trading in an efficient market under Plaintiffs' theory that this disclosure partially revealed the "truth" of Defendants' alleged fraud). *Id.* at 28 (citing Tabak Rpt. ¶ 32; Garmaise Rpt. ¶¶ 151–157). Third, Dr. Tabak admits that options will not always trade in efficient markets just because the underlying stock does, because options and common stock "don't always move together." *Id.* (citing Tabak Tr. at 69:12–19; Garmaise Rpt. ¶¶ 126–132 (explaining why option efficiency does not automatically follow from stock efficiency)). Defendants cite to a case in which the court questioned whether that assumption was valid. *Id.* at 28–29 (citing *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *13 n.11 (N.D. Cal. Feb. 4, 2022) (*Apple I*)).

Plaintiffs counter that Boeing options are derivatives of Boeing common stock and it is undisputed that Boeing common stock traded in an efficient market, which is strong evidence that Boeing options also trade efficiently. Reply at 24 (citing Tabak Rpt. ¶¶ 66–69). Numerous courts, according to Plaintiffs, have reached the same conclusion. *Id.* (citing, *inter alia*, *In re Apple Inc. Sec. Litig.*, 2023 WL 2763952, at *1 (N.D. Cal. Mar. 28, 2023) (*Apple II*); *Rougier*, 2019 WL 6111303, at *14). As for *Apple*

*I*, Plaintiffs point out that the *Apple* court later certified a class upon the plaintiffs' submission of a supplemental expert report from Dr. Don Chance, explaining the connection between the efficiency of common stock and options. Reply at 25 (citing *Apple II*, 2023 WL 2763952, at *1). Plaintiffs provide a comparison of portions of Dr. Chance's expert report, which the court in *Apple II* found to be sufficient, and Dr. Tabak's. *Id.* at 25–26 (comparing, *inter alia*, Tabak Rpt. ¶ 68 ("If the put-call parity relationship is violated, then there is an arbitrage opportunity, which would indicate a lack of efficiency in at least one of the markets.") *with* 434-5, Chance Rpt. ¶ 56 ("In the world of options, market efficiency is driven by the possibility of engaging in arbitrage against anyone who fails to understand the most fundamental rule: the law of one price.")). Dr. Tabak further explained in his reply report how the fundamentals of options markets lead to efficiency.[15] *Id.* at 26 (citing Tabak Reply Rpt. ¶¶ 73, 79–80, 82 n.56, 83–84).

The Court finds that Plaintiffs have the better of the argument. Beyond simply relying on the correlation between the efficiency of common stock and options, Dr. Tabak analyzed the efficiency of the markets for Boeing options by testing the extent to which damageable Boeing options (i.e., options with open interest on at least one Class Period disclosure day) satisfied the "put-call parity condition." Memo. Class Cert. at 23 (citing Tabak Rpt. ¶¶ 70–80). Plaintiffs explain that the put-call parity condition is a measure of the alignment between the prices of an issuer's stock and options; satisfaction of the condition indicates that, if the market for the issuer's stock

[15] The Court considers Defendants' Sur-Response and Dr. Gamaise's Sur-Response Report.

is efficient, the market for its options is as well. Memo. Class Cert. at 23 (citing Tabak Rpt. ¶¶ 70–80; *Carpenters Pension Tr. Fund*, 310 F.R.D. at 81). Even if the options market is efficient, reason Plaintiffs, one would not expect the put-call parity condition to hold where trading costs are arbitrarily low; here, Dr. Tabak determined that, even under the extremely conservative assumption that there were ***zero*** trading costs, 98.56% of the Options Data Sample satisfy the put-call parity condition. *Id.* at 23–24 (citing Tabak Rpt. ¶ 76). Plaintiffs point out that courts have found options markets efficient where 63% of the options analyzed meet put-call parity, with zero trading costs. *Id.* at 24 (citing *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013); Decl. of David Tabak, Ph.D., at 31, *In re Merck & Co. Inc., Sec., Deriv. & "ERISA" Litig.*, No. 2:05-cv-02367-SRC-CLW Dkt. 319-9 (D.N.J. April 10, 2012)). Defendants rely on Dr. Garmaise's report to argue that, simply because a given option passes the put-call parity test does not mean that the market for that option is efficient. *Id.* (citing Garmaise Rpt. ¶¶ 140–143). As Plaintiffs correctly state in reply, however, numerous courts have found the fact that options pass the put-call parity test to be sufficient to establish options efficiency. Reply at 26 (citing, *inter alia*, *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *17 (N.D. Cal. Mar. 11, 2024) (efficiency of underlying stock and "standard put-call parity evaluation" establishes the efficiency of options); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2023 WL 4981716, at *6 (D.N.J. Aug. 3, 2023) (crediting put-call parity as evidence of options efficiency). Defendants do not distinguish this authority in their Sur-Response. *See* Sur-Resp.

As for Defendants' argument that Dr. Tabak concedes that the existence of an "arbitrage opportunity . . . would indicate a lack of efficiency," Resp. at 29 (quoting Tabak Rpt. ¶ 68), but "academic literature has documented instances of arbitrage opportunities and option mispricing," *id.* (quoting Garmaise Rpt. ¶ 132), the Court also finds this insufficient to undermine a finding of efficiency. Defendants rely on Dr. Garmaise's report, in which he explains that Dr. Tabak's put-call parity analysis does not "show that there are no other relevant arbitrage opportunities (other than put-call parity violation) or other mispricing" for Boeing options. *Id.* (quoting Garmaise Rpt. ¶ 128). As Plaintiffs point out in Reply, however, Dr. Garmaise does not establish that such hypothetical opportunities apply to Boeing options. *Id.* The court in *Apple II* found the defense expert's similar contention of "potential for inefficiencies" to be "insufficient to overcome plaintiff's showing of overall efficiency." 2023 WL 2763952, at *1. Like the court in *Apple II*, the Court declines to "resolve this battle between the experts" at class certification. *Id.* So too does the Court find that Defendants' argument that the put-call parity test does not test whether the price of an option "correctly measures the value of the option" to be insufficient to undermine a finding that Boeing's options were efficient. Resp. at 29 (citing Garmaise Rpt. ¶ 142). As Plaintiffs point out in Reply, Dr. Garmaise adduces no evidence that Boeing options were mispriced; therefore, his speculation is insufficient to overcome Plaintiffs' showing. *See Apple II*, 2023 WL 2763952, at *1. Nor do Defendants point to evidence of mispriced options in their Sur-Response. *See* Sur-Resp.

As Plaintiffs correctly point out, Reply at 27, Defendants fail to cite any authority finding that efficiency must be shown as to each options security, and courts have explicitly rejected the "contention that efficiency of the market must be empirically established individually for every option at issue." *Industriens*, 2023 WL 4981716, at *6 ("*Basic* requires a showing about the efficiency of the market, not of each of the [] options series potentially at issue in this case"). Moreover, the Court agrees with Plaintiffs that Dr. Tabak's analysis of thousands of individual put-call pairs that he found to overwhelmingly behave efficiently to be sufficient at this stage to show an efficient options market. Reply at 27 (citing Tabak Rpt. ¶¶ 65–81; Tabak Reply Rpt. ¶¶73–88). Finally, the Court also agrees with Plaintiffs that Plaintiffs and Dr. Tabak did not need to apply the *Cammer* and *Krogman* factors to options, and thus the Court does not examine Defendants' arguments related to these factors. *Id.* at 28 (citing *Apple II*, 2023 WL 2763952, at *2 ("direct application of [the *Cammer* and *Krogman* factors] to options is not a useful measure of efficiency.").

Accordingly, for purposes of class certification, the Court finds that Plaintiffs have sufficiently shown that Boeing's options traded in an efficient market.

**b. Damages**

Plaintiffs propose calculating damages using substantially the same out-of-pocket damages methodology used for common stock, combined with the formulaic application of an options pricing formula (like the widely accepted Black-Scholes formula) to translate artificial inflation into corresponding options price inflation during the Class Period. Reply at 29 (citing Tabak Rpt. ¶ 88). According to Plaintiffs,

courts routinely accept this methodology for calculating damages options in securities fraud cases. *Id.* at 29–30 (citing, *inter alia*, *Rougier*, 2019 WL 6111303, at *15 n.5 (accepting proposed method of calculating options damages by using the Black-Scholes formula); *Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at *9 (W.D. Pa. Dec. 31, 2019) (same)).

Defendants take issue with Plaintiffs' reliance on the Black-Scholes formula to calculate classwide damages for option traders. Resp. at 30. Courts, contend Defendants, have rejected the "mere recitation of the Black-Scholes formula as a substitute for an actual damages model for options." *Id.* (citing *Apple I*, 2022 WL 354785, at *12–13). Nor does Dr. Tabak, assert Defendants, propose a methodology for calculating the degree of stock-price volatility that would have exited absent the alleged misstatements. *Id.*

Plaintiffs reply that, contrary to Defendants' contention, damages for option trades can be computed using the Black-Scholes formula "to translate artificial inflation into corresponding options price inflation during the Class Period." Reply at 29. The Court agrees. While Defendants maintain that the court in *Apple I* rejected this method, as Plaintiffs correctly point out, the court in *Apple II* rejected Defendants' argument that there were "differences that exist between the various options that would prevent them from being calculated in exactly the same way or at the same time," holding that the "[p]laintiff is not required to show that each class member's damages can be calculated at once." 2023 WL 2763952, at *2. Like the expert in *Apple II*, Dr. Tabak has confirmed that his methodology can be applied to

each member of the proposed class. Reply at 30 (citing Tabak Reply Rpt. ¶¶ 119–21, 125).

True, Dr. Tabak's original Report failed to explain how he would account for the volatility in Boeing's stock price absent the alleged fraud (an input to the Black Scholes formula). Resp. at 30 (citing Garmaise Rpt. ¶ 162); *see* Tabak Rpt. ¶ 88. To address this concern, Dr. Tabak's Reply Report expands on his methodology. Tabak Reply Rpt. ¶¶120–25. And Plaintiffs point to at least one court that has rejected a similar argument as premature at the class certification stage, as the particular method for calculating damages "does not affect the validity of Plaintiffs' proposed damages model for all proposed Class members." Reply at 30 (quoting *Vrakas*, 2019 WL 7372041, at *9–10). Again, Defendants do not address this authority in their Sur-Response. *See* Sur-Resp. at 20.

The Court finds that, at this stage, Plaintiffs have sufficiently established a methodology for calculating damages for options on a class-wide basis.

**B. Superiority**

The final requirement under Rule 23(b)(3) is that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is satisfied if a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (cleaned up). The superiority inquiry requires courts to assess the fairness and efficiency of class adjudication "with

an eye toward other available methods." *Mullins*, 795 F.3d at 664 (cleaned up). In general, "securities cases easily satisfy the superiority requirement of Rule 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (cleaned up).

Rule 23(b)(3) requires the Court to consider four factors when determining superiority: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The Court agrees with Plaintiffs—and Defendants do not dispute—that this action meets all four factors. Memo. Class Cert. at 25. First, "[a]s with many securities law cases, this case involves a large number of investors who are likely to be geographically dispersed" and many "investors are also likely to have relatively small claims making it expensive to seek recovery through individual litigation." *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. at 568. Second, Class members' interests in individually controlling the prosecution of separate actions are minimal. Third, concentrating the litigation in this forum will promote judicial efficiency by resolving the claims of thousands of shareholders in one case. Fourth, there are no manageability concerns. *See Mullins*, 795 F.3d at 663–64. Accordingly, the Court finds the class action device to be the superior method for fairly and efficiently adjudicating this action.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23 [388]. The Court certifies the following Class: all persons or entities who purchased or otherwise acquired Boeing common stock and/or call options or sold put options between November 7, 2018 and October 18, 2019, inclusive, and were damaged thereby. The Court also appoints Plaintiffs as Class Representatives, and approves Plaintiffs' selection of Bernstein Litowitz Berger & Grossman LLP as Class Counsel (with Kessler Topaz Meltzer & Check, LLP as additional counsel for the Class).

Dated: March 16, 2026

United States District Judge
Franklin U. Valderrama

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION | No. 19-cv-02394<br><br>Judge Franklin U. Valderrama |

**SEALED ORDER**[1]

In 2018 and 2019, Boeing's 737 MAX plane was involved in two fatal plane crashes, the Lion Air Crash and the Ethiopian Airlines Crash. Following the crashes, Boeing's former President and CEO, Dennis Muilenburg, and its former CFO, Gregory Smith, made public statements in response to the crashes concerning, among other things, the safety of the 737 Max plane. Plaintiffs, a group of pension funds and private investors, sued Boeing, Muilenburg, (together, Defendants), and Smith,[2] on behalf of shareholders, under Section 10(b) of the Securities Exchange Act. R. 275, First Amended Complaint (FAC).[3] Plaintiffs allege that Defendants made false and misleading statements in the wake of the two catastrophic plane crashes, with the

---

[1]Portions of Plaintiffs' motion was filed under seal. Because this Order may contain privileged information that was submitted to the Court under seal, the Court will issue its Order under seal so the parties may meet and confer about proposed redactions. The parties are to file a joint position statement within 3 business days of the entry of this Order, explaining what (if any) redactions are needed in the text of the Order, and why (bearing in mind the strict standard against secret filings, *see generally Mitze v. Saul*, 968 F.3d 689 (7th Cir. 2020)). That position statement may be filed under seal. After considering the proposed redactions, the Court will issue a public version of the Order.

[2]The Court granted Defendants' motion to dismiss in part on September 30, 2024 and dismissed all claims against Smith. R. 346, MTD Order.

[3]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

intent to deceive investors, which artificially inflated Boeing's stock price and caused injury to the putative class members. *Id.*

On March 16, 2026, the Court granted in part and denied in part Plaintiffs' motion for class certification. R. 486, Class Cert. Order (the Order). The Court found, among other things, that Plaintiffs' expert, Dr. David Tabak's, proposed damages model—namely a model based on the theory that the 737 MAX would have been grounded had the truth been disclosed at the start of the Class Period (the Grounding Theory)—was unconnected to the theory of liability alleged in the FAC. On March 27, 2026, Plaintiffs moved for limited reconsideration of the Court's Order, arguing that the Court erred because the Grounding Theory was expressly alleged in the FAC. R. 489, Mot. Reconsider. For the reasons stated below, Plaintiffs' motion for reconsideration is granted. The Court also relatedly reconsiders its decision to allow Plaintiffs to proceed on the materialization of the safety risks that Defendants allegedly concealed (the Materialization of the Safety Risks Theory).

**Legal Standard**

"Motions to reconsider interlocutory orders are governed by Federal Rule of Civil Procedure 54(b), which provides that any order that does not resolve all claims as to all parties may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Saccameno v. Ocwen Loan Servicing, LLC*, 2018 WL 1240347, at *2 (N.D. Ill. Mar. 9, 2018) (cleaned

up).[4] "Motions for reconsideration serve the narrow purpose of correcting manifest errors of law or fact or presenting newly discovered evidence." *In re NorthShore Univ. Healthsystem Antitrust Litig.*, 2016 WL 11430715, at *1 (N.D. Ill. Sept. 19, 2016) (citing *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)). A manifest error of law occurs "when the district court commits a wholesale disregard, misapplication, or failure to recognize controlling precedent." *Burritt v. Ditlefsen*, 807 F.3d 239, 253 (7th Cir. 2015) (cleaned up). A party may also use a motion for reconsideration to alert the court to "a significant change in the law or facts, the court's misunderstanding of a party's argument, or a party's contention that the court ruled on an issue that was not properly before it." *Janusz v. City of Chicago*, 78 F. Supp. 3d 782, 787 (N.D. Ill. 2015), *aff'd*, 832 F.3d 770 (7th Cir. 2016) (citing *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008)).

Motions for reconsideration are "disfavored." *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 911 (N.D. Ill. 2015). Accordingly, a motion for reconsideration is not a vehicle to rehash arguments that were previously presented to the court, "and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the [ruling]." *In re NorthShore Univ. Healthsystem Antitrust Litig.*, 2016 WL 11430715, at *1 (cleaned up). Whether to grant or deny a motion to reconsider is within the court's discretion. *See Patrick*, 103 F. Supp. 3d at 911.

---

[4]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

## Background

The Court assumes familiarity with the underlying facts of this case, as set forth in its Orders on Defendants' motion to dismiss the FAC and on Plaintiffs' motion for class certification. R. 346, MTD Order at 3–25; Class Cert. Order at 2–9. The Court briefly addresses the procedural posture and relevant Orders to Plaintiffs' reconsideration motion.

The previously assigned judge[5] partially granted Defendants' motion to dismiss Plaintiffs' complaint, in which he did not allow Plaintiffs to proceed on the Ethiopian Airlines Crash as a corrective disclosure. R. 191 at 62, 64 n.13. Plaintiffs filed an amended complaint in which they included additional allegations related to Defendants' misrepresentations and the concealed facts that Plaintiffs allege caused the Ethiopian Airlines Crash. FAC. Defendants again moved to dismiss, and this Court sustained the Ethiopian Airlines Crash as a corrective event. MTD Order at 49.

Plaintiffs subsequently moved for class certification. R. 388, Mot. Class Cert. In their motion, Plaintiffs argued that they satisfied all the requirements of Federal Rule of Civil Procedure 23(a) and (b), and that, in relevant part, they demonstrated via Dr. Tabak's report that "Boeing common stock traded in an efficient market throughout the Class Period, and damages [could] be calculated based on a class-wide methodology . . . consistent with Plaintiffs' theory of liability." R. 388-1, Memo. Class

[5]This case was originally assigned to Judge Tharp, who issued the Order on Defendants' first motion to dismiss. R. 191. The case was reassigned to Judge Maldonado on October 3, 2022 (R. 204) and then reassigned to this Court on July 10, 2024 (R. 337).

Cert. at 2–3. From Plaintiffs' perspective, "their proposed model calculate[d] classwide damages by using an event study to measure the amount of artificial inflation in Boeing stock on each day of the Class Period." *Id.* at 16. Plaintiffs did not specifically explain in their motion the damages theory they planned to employ relating to the Ethiopian Airlines Crash as a corrective event.

Defendants opposed the motion, arguing, among other things, that Dr. Tabak failed to explain how he will account for Plaintiffs' materialization-of-the risk theory of liability. R. 418, Class Cert. Resp. at 17. For the first time in reply, Plaintiffs explained that they were relying on Dr. Tabak's damages model in which he assumed that, if Defendants had disclosed the full truth, there is a 100 percent chance that the 737 MAX would have been grounded at the outset of the class period. R. 434, Class Cert. Reply at 12–13. Plaintiffs practically disavowed the alternative damages methodology, the Materialization of the Safety Risks Theory. Under that theory, Dr. Tabak would calculate the inflation rates over the Class Period based on the materialization of concealed safety risks that were not 100 percent sure to occur. Plaintiffs posited that, if Plaintiffs were "required to supply a distinct methodology for a 'materialization of the risk' theory of loss causation (which they [were] not), Dr. Tabak's out-of-pocket damages methodology [was] sufficiently flexible to account for the realization of a concealed risk." *Id.* at 14.

The Court granted in part and denied in part Defendants' motion for leave to file a sur-response and sur-rebuttal expert report, stating that it would consider the portions of Defendants' sur-response and sur-rebuttal report that were "responsive to

arguments or evidence included in Plaintiffs' reply that could have and should have been raised in their opening brief." R. 480. The Court considered Defendants' sur-response to Plaintiffs' arguments about Dr. Tabak's damages model related to the Ethiopian Airlines Crash as a corrective event, which, as noted above, were substantively raised for the first time in Plaintiffs' reply. Class Cert. Order at 35 n.12.

Four days before the Court issued its Class Certification Order and long after Plaintiffs filed their motion for class certification, Plaintiffs moved for leave to supplement the class certification record with Dr. Tabak's "full merits report" (Merits Report). R. 483, Pls. Mot. Suppl. The Merits Report includes a complete damages model, which Plaintiffs argued mooted Defendants' primary argument against class certification—that Dr. Tabak provided only a "preliminary" methodology that failed to satisfy the requirement under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) that plaintiffs demonstrate that damages can be calculated on a classwide basis consistent with their liability theory. *Id.* The Court denied Plaintiffs' motion for leave to supplement the record as moot, finding that the proposed supplemental report did not change the Court's analysis. Class Cert. Order at 23 n.6; *see also* R. 487.

In its Class Certification Order, the Court agreed with Defendants that the Grounding Theory, that is, the "but for" assumption that the 737 MAX would have been grounded had Defendants told the truth at the start of the Class Period, was "untethered to the theory of liability alleged in the FAC." Class Cert. Order at 42. Additionally, the Court found that Dr. Tabak lacked the expertise to opine that the 737 MAX would have been grounded or allowed to continue flying, resulting in a

crash. *Id.* The Court disagreed with Defendants, however, that the Grounding Theory appeared for the first time in Plaintiffs' class certification reply. *Id.* at 41. The Court allowed Plaintiffs to proceed on the Materialization of the Safety Risks Theory. *Id.* at 42–43.

**Analysis**

Before the Court is Plaintiffs' fully briefed motion for reconsideration, in which Plaintiffs argue that the Court erred by not allowing them to proceed on the Grounding Theory. According to Plaintiffs, the Court "patently misunderstood" the FAC by crediting Defendants' mischaracterization, raised in Defendants' sur-response, of the FAC's allegations and the "materialization of risk" approach. R. 490, Memo. Reconsider at 11–12 (citing, *inter alia*, *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d at 1191 (7th Cir. 1990)). Plaintiffs posit that if the Court does not correct its Order, its "finding risks confusion, further delay, and improperly constraining Plaintiffs' damages model at trial." *Id.* at 12.

## I. FAC

Although argued for the first time in reply, Plaintiffs raise as a threshold matter that because the FAC is a pleading, it did not need to allege "every detail of their damages approach." R. 496, Reply at 6. More specifically, Plaintiffs did not need to "articulate[] Dr. Tabak's damages theory based on an assumed grounding of the 737 MAX at the start of the class period," as argued by Defendants. *Id.* (citing Class Cert. Resp. at 11). Instead, for loss causation purposes, Plaintiffs needed only to

provide Defendants with "some indication of the loss and causal connection [they had] in mind." *Id.* (quoting MTD Order at 49).

Plaintiffs also contend, in both their motion and reply, that (regardless of what they were required to plead in support of their loss causation theory) the FAC explicitly characterized the Ethiopian Airlines Crash as revealing the "true nature of the risk[]" of a "grounding." Memo. Reconsider at 12 (quoting FAC ¶ 278 ("The Ethiopian Airlines Crash also revealed the true nature of the risks of (1) a catastrophic crash involving the 737 MAX and (2) regulatory action grounding the 737 MAX fleet. The true nature of these risks had been concealed by Defendants' misstatements and omissions . . . ."')). Plaintiffs maintain that the FAC identified as "material information that would have properly informed investors about [the risks they faced]," that "the limited testing Boeing performed showed the 737 MAX did not meet regulatory safety requirements" and "the 737 MAX should not have been certified, because certification was obtained by defrauding the FAA during the certification process." *Id.* (quoting FAC ¶ 278). And the FAC, from Plaintiffs' perspective, also alleged false statements made by Defendants in the wake of the Lion Air Crash that effectively prevented the grounding of the 737 MAX. *Id.* at 12–13 (citing, *inter alia*, FAC ¶ 14 (Defendants' misrepresentations "ensured that airline customers would continue to place orders for the 737 MAX planes – and that the planes would remain in the skies"); FAC ¶ 215 (after the Lion Air Crash, Boeing senior executive texted internally: "We need to prepare for FAA to stop delivery for non compliance")). Plaintiffs posit that if these facts had been disclosed at the

beginning of the Class Period, it would have led to a grounding of the 737 MAX. *Id.* And, importantly, the "Corrective Event Summary" for March 10, 2019 alleges: "On Sunday March 10, 2019, Ethiopian Airlines Flight 302 crashed six minutes after takeoff. Multiple regulators grounded all 737 MAX airplanes in their jurisdiction." FAC ¶ 525. Therefore, argue Plaintiffs, these allegations support Plaintiffs' and Dr. Tabak's approach at class certification of assuming that the disclosure of the 737 MAX's true safety issues would have resulted in a formal or *de facto* grounding. Memo. Reconsider at 13.

Defendants retort that the Court did not err because "it was not clear from the face of the FAC that Plaintiffs were pursuing . . . a damages theory" based on an assumed grounding of the 737 MAX. R. 495, Resp. at 9 (quoting Class Cert. Order at 41). The way Defendants see it, Plaintiffs "quote miscellaneous paragraphs of the [FAC]," which "simply discuss at a high level various different risks Boeing faced at the time." *Id.* at 11 (citing Memo. Reconsider at 1–2, 6–7, 12–13). Defendants also point back to Plaintiffs' arguments in opposition to Defendants' motion to dismiss the FAC, in which Plaintiffs argued that the allegations of the FAC "'demonstrate that the Ethiopian Airlines Crash . . . was a materialization of the safety risks Defendants concealed.'" *Id.* (quoting R. 305, Pls.' MTD Resp. at 40). Finally, Defendants note that Plaintiffs identify as the relevant alleged disclosure the Ethiopian Airlines March 10, 2019 accident itself—not the grounding of the 737 MAX by various countries on March 11 and 12, 2019, and the FAA's grounding on March 13—and attempt to plead loss causation by citing to the decline in Boeing stock prices on March 11 and 12.

Resp. at 12. These allegations—as well as Plaintiffs' earlier arguments at the dismissal stage—contend Defendants, undermine Plaintiffs' new theory that the risk that materialized on March 10, 2019 was not safety related, but rather the risk that the 737 MAX would be grounded. *Id.*

The Court starts with the threshold question raised by Plaintiffs in reply: whether they needed to "articulate[] Dr. Tabak's damages theory based on an assumed grounding of the 737 MAX at the start of the class period." Reply at 6. "In most instances, litigants waive any arguments they make for the first time in a reply brief."[6] *United States v. Desotell*, 929 F.3d 821, 826 (7th Cir. 2019) (citing *Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012); *Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011)). But, given the nature of the argument, and the Court's finding below, the Court briefly addresses it.

The parties' debate centers on Plaintiffs' theory of damages. To establish a claim under Section 10(b) of the Securities Exchange Act, a plaintiff must allege, among other things, loss causation. *Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 994 (7th Cir. 2007). Loss causation is the proximate "causal connection between the material misrepresentation and the loss" allegedly suffered by plaintiffs. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs' burden in pleading loss

[6]Plaintiffs frame the argument as one based on Defendants' response. *See* Reply at 6 (citing Resp. at 11). But the proposition raised in response with which Plaintiffs take issue is the same proposition raised in Defendants' sur-response to Plaintiffs' class certification motion (that is, that "Dr. Tabak's 'present damages theory' appears nowhere in the Amended Complaint," R. 452-1, Class Cert. Sur-Resp. at 8, and on which the Court relied in part in its Class Certification Order, Class Cert. Order at 41–42. In what is becoming a somewhat concerning and recurrent theme in this case, Plaintiffs could have and should have raised this argument in their opening motion.

causation is not a heavy one. *Dura Pharms.*, 544 U.S. at 347. Plaintiffs are correct that, as the Court stated in its MTD Order, loss causation is subject to the notice pleading standard of Rule 8, so loss causation allegations must only "'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" MTD Order at 48–49 (quoting *Dura Pharms.*, 544 U.S. at 347); *see also In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 821 (N.D. Ill. 2017) (citing *Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) ("To plead loss causation in a private securities action, the complaint need only allege facts that support an inference that Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.")). It is also important to note, however, that as Defendants stressed in their class certification response and sur-response, to satisfy *Comcast*, a plaintiff must "match[ ] the theory of liability to the theory of damages." *In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir. 2014) (explaining that plaintiffs may proceed on one of two damages theories); *see also Comcast*, 521 U.S. at 38 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.") (cleaned up) (emphases in original). Plaintiffs do not explain how a damages theory could proceed under *Comcast* if it does not match a previously alleged liability theory.

The Court is skeptical that sweeping allegations that Plaintiffs lost value to their shares because the Ethiopian Airlines crash corrected prior misstatements

made by Defendants is sufficient under Rule 8(a) and *Dura*. While it is true that loss causation is a "fact-based inquiry that need not be proven until later stages of litigation," MTD Order at 48 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (cleaned up)), the Court finds it to be a stretch that Plaintiffs would not need to plead that the Ethiopian Airlines Crash caused Plaintiffs' losses because it revealed the falsity of Defendants' statements about the 737 MAX's safety as it related to regulators continuing to allow it to fly. But the Court need not make a definitive finding on what is sufficient under Rule 8(a) and *Dura*, because, as discussed below, the Court finds that Plaintiffs did include several allegations supporting the Grounding Theory (but also, as discussed below, that did not become clear until Plaintiffs' class certification reply).

As an initial matter, the Court agrees with Defendants that the focus of Plaintiffs' materialization-of-the risk theory as to the Ethiopian Airlines Crash is that the crash revealed *safety* risks allegedly concealed by Defendants' statements. The FAC alleged that "over the two-day trading period following the Ethiopian Airlines Crash, Boeing's stock price plummeted $47.13 per share" because the crash revealed that "contrary to Defendants' statements, the 737 Max was not safe." FAC ¶¶ 276–77. Plaintiffs further alleged that Defendants' "statements misrepresented the magnitude of the safety deficiencies in the 737 Max." *Id.* ¶ 525. Indeed, as stated above, Plaintiffs stressed that the "Ethiopian Airlines Crash . . . was a materialization of the safety risks Defendants concealed" in opposing Defendants' motion to dismiss the FAC. *See* Resp. at 9 (quoting R. 305 at 40).

So, contrary to Plaintiff's contention, it was not obvious, at least to the Court, that Plaintiffs were explicitly also pursing a Grounding Theory. But, viewing the FAC in its totality—and in particular paragraph 278's allegation that the Ethiopian Airlines Crash "revealed the "true nature of the risk[] of . . . regulatory action grounding the 737 Max fleet," FAC ¶ 278—the FAC reveals Plaintiffs' loss causation theory to encompass not only the crash itself, but also the subsequent grounding. And, as Plaintiffs point out in reply, the Court's motion to dismiss ruling did not *foreclose* grounding as one of the safety-related risks that materialized following the Ethiopian Airlines crash; to the contrary, it expressly recognized grounding as a driver of stock price decline. MTD Order at 18.

Finally, the Court finds that, at this stage, Plaintiffs' Grounding Theory is not undermined because Plaintiffs did not allege the FAA's March 13, 2019 grounding order as a corrective disclosure. Reply at 6–7. Plaintiffs note that regulators and airlines worldwide began grounding the 737 MAX immediately after the crash: specifically, China, Indonesia, and Mongolia issued grounding orders before the market opened on March 11; multiple airlines grounded the MAX that same day; and Singapore, India, Turkey, Australia, Malaysia, the United Kingdom, and other jurisdictions followed on March 12. *Id.* at 7 (citing FAC ¶ 275). The EU's safety agency grounded the 737 MAX on March 12, citing "similarities" between data that was coming out from the Ethiopian Airlines Crash and "the Lion Air accident data." *Id.* (quoting FAC ¶ 275). For now, the Court will accept Plaintiffs' argument that, "[b]y

the time the FAA formally acted on March 13, the market had already incorporated the inevitable grounding into Boeing's stock price." *Id.*

All in all, the Court finds that the FAC contains sufficient allegations to support Plaintiffs' Grounding Theory: the 737 MAX was grounded because of the safety defects that Defendants hid from the public beginning at the start of the Class Period, and after the Ethiopian Airlines Crash, the market's reaction was immediate and unambiguous—regulators, airlines, analysts, and investors all recognized that the 737 MAX would be grounded because it had serious, previously concealed safety defects that made regulatory action inevitable, driving Boeing's stock price down. Reply at 7–8 (citing FAC ¶¶ 215, 237, 255, 268, 274–76, 278, 295, 502).

## II. Dr. Tabak's Model for the Grounding Theory

Plaintiffs maintain that their materialization of the risk approach encompasses Dr. Tabak's damages model based on the Grounding Theory. Memo. Reconsider at 13–14. Specifically, the materialization of the risk acts as an input into the "'out-of-pocket' measure—the difference between what shareholders paid and what they should have paid had the truth been disclosed[, which] is 'the correct measure of damages in a Rule 10(b)-5 case.'" *Id.* at 13 (quoting Class Cert. Order at 23). Plaintiffs maintain that their aviation experts' opinions show that the 737 MAX would have been grounded if the truth had been disclosed. *Id.* As such, reason Plaintiffs, no "discount" for a risk that was not 100 percent sure to materialize is required for the calculation. *Id.* at 14 (citing R. 489-2, Dr. Tabak Article). Therefore,

argue Plaintiffs, under the "materialization of risk" framework, damages should be calculated as Dr. Tabak proposed. *Id.*

Defendants correctly point out that Plaintiffs, through Dr. Tabak, indicated in their class certification reply that the "materialization of the risk" loss causation theory is not relevant to [Dr. Tabak's] expected damages model for the Ethiopian Airlines crash." Resp. at 10 (citing R. 434, Class Cert. Reply. at 12 ("Dr. Tabak explained that a 'materialization of the risk' loss causation theory is not relevant to his expected damages model for the Ethiopian Airlines crash.")). And the Court also agrees with Defendants that they properly challenged Dr. Tabak's Grounding Theory damages model in their sur-response, given that Plaintiffs neither mentioned it in their opening class certification brief, nor did Dr. Tabak include it in his initial report. *Id.* at 11.

There are several ways that a plaintiff can prove loss causation under Section 10(b). One is called the materialization of the risk. *Ray*, 482 F.3d at 995. Under that approach, a plaintiff must "prove that it was the very facts about which the defendant lied which caused its injuries." *Id.* (cleaned up). While the Court agrees with the above points advanced by Defendants, the Court agrees with Plaintiffs that, even with that statement in their reply brief, they did not fully disavow the materialization of the risk theory. Reply at 10. That is, in their class certification reply, Plaintiffs explained that "under well-established Seventh Circuit law, 'materialization of the risk' is simply a way to describe loss causation—it is not . . . a separate theory of liability." Class Cert. Reply at 9–10 (citing *Schleicher v. Wendt*, 618 F.3d 679, 683–84 (7th Cir.

2010)). Plaintiffs clarify that the Grounding Theory is in fact encompassed within the materialization of the risk "theory of loss causation," but that the Grounding Theory "makes the concept irrelevant to the damages model's mechanics" because the Grounding Theory assumes that the concealed risk of grounding was 100 percent.[7] Reply at 10; *see also id.* at 9 (citing *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ("If the probability is less than 100 percent, the stock price correction after the risk materializes will be larger than the pre-materialization inflation," but if "the probability of the risk materializing was 100 percent," "the stock price movement on the date of correction . . . will . . . equate to inflation on the date of purchase."). The Court finds that Dr. Tabak's damages model based on the Grounding Theory is consistent with the materialization of the risk framework.

Additionally, the Court finds that it misunderstood the evidence that Plaintiffs intended to introduce in support of the assumption that the 737 MAX would have been grounded at the beginning of the Class Period had the truth been known. As Plaintiffs clarify in their reconsideration motion, Dr. Tabak does not offer this opinion; rather, his damages analysis is based on the assumption premised on Plaintiffs' aviation experts' opinions. Reply at 14. The Court's misunderstanding was occasioned in large part by Plaintiffs' failure to adequately explain the support behind

[7]As Plaintiffs stated in their class certification reply, and again on their reconsideration reply, Dr. Tabak's Grounding Theory damages model removes all crash-specific estimated costs (e.g., expected liability to passengers' families) and only back-casts the remainder of the decline. Reply at 8 n.4; *see also* Pls.' Class Cert. Reply at 13 n.7.

this theory in the class certification briefing. However, based upon their clarification in the instant motion, the Court finds the evidence sufficient at this stage.

In closing, the Court must point out that while the Court is granting the motion to reconsider, having concluded that the Grounding Theory was asserted in the FAC, Plaintiffs do not have unclean hands in the confusion. Plaintiffs' motion for class certification was not as robust as Plaintiffs' reply in support of the motion. Not only that, but in their reply, for the first time Plaintiffs sought to include an updated report from Dr. Tabak. Predictably and understandably, Defendants objected and sought leave to file a sur-response to address the new arguments and updated report. R. 437; 452. Defendants, however, did not move the Court to strike the reply to the extent it included new arguments or to strike Dr. Tabak's Reply Report. *Id.* Wary of further delay in resolving the motion for class certification, the Court plowed ahead, considering Defendants' sur-response but prohibiting Plaintiffs from filing a sur-reply. R. 480. In hindsight, that was perhaps not the best course of action. In short, based on the Court's misunderstanding, the Court finds that reconsideration is warranted. *See Bayer Healthcare, LLC v. Zoetis Inc.*, 2016 WL 4179087, at *8 (N.D. Ill. Aug. 8, 2016).

### III. Materialization of the Safety Risks Model and Consideration of Dr. Tabak Merits Report

The Court's review of the parties' reconsideration briefs, as well as their underlying briefs for and against class certification, have clarified that Plaintiffs did not really intend to seek class certification based on the Materialization of the Safety Risks Theory (meaning concealed safety risks separate and apart from the grounding

of the 737 MAX that were not 100 percent sure to occur). That is, in their reply in support of class certification, Plaintiffs took the position that they were *not* required to supply a distinct methodology for a "materialization of the risk" theory of loss causation; however, Dr. Tabak *could* construct a damages model that would assist the jury in calculating inflation rates over the Class Period based on a "materialization of the risk" theory. Class Cert. Reply at 14. As stated above, the Court allowed Plaintiffs to proceed on this theory. As both parties discuss in their reconsideration briefs, though, Dr. Tabak's Merits Report does not include a damages model based on this theory. *See* Memo. Reconsider at 15 (requesting leave for Dr. Tabak to amend his Merits Report to include a damages model based on the Materialization of the Safety Risks Theory if the Court denies the motion for reconsideration). True, a court should not consider "new evidence" on a motion for reconsideration, *see In re NorthShore Univ. Healthsystem Antitrust Litig.*, 2016 WL 11430715, at *1, but Plaintiffs requested that the Court consider Dr. Tabak's Merits Report when deciding their class certification motion—and, the Merits Report only clarifies what the Court should have understood from the underlying class certification briefing: Plaintiffs only sought certification based on the Grounding Theory, not the Materialization of the Safety Risks Theory. Considering the Court is now allowing Plaintiffs to proceed on the Grounding Theory, the Court also finds it appropriate to *sua sponte* reconsider its decision to allow Plaintiffs to proceed on the Materialization of the Safety Risks Theory. *See Saccameno*, 2018 WL 1240347, at *2 (a court may reconsider a non-final order at any time); *see also Herrera v. Fuentes,*

2023 WL 3601907, at *4 (N.D. Ill. May 23, 2023) (the court *sua sponte* reconsidered a motion *in limine* ruling entered earlier in the case); *Gavin v. McGinnis*, 866 F. Supp. 1107, 1108 (N.D. Ill. 1994) (*sua sponte* reconsideration of order on motion to dismiss). Therefore, the Court reconsiders that decision and concludes that Plaintiffs may not proceed on a classwide basis on the Materialization of the Safety Risks Theory. Practically, this will not impact the litigation as it proceeds, since Plaintiffs do not have an expert who has provided a damages model for this theory.

## Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion to reconsider [489].

Dated: June 18, 2026

United States District Judge
Franklin U. Valderrama